**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | | |
|---|---|---|
| NOEMI TORRES RONDA; ANGELO RIVERA LAMBOY | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v., | * | |
| | * | CIVIL NO.: |
| JOINT UNDERWRITING ASSOCIATION; | * | |
| CARIBBEAN ALLIANCE INSURANCE COMPANY; | * | |
| CHARTIS INSURANCE COMPANY OF PUERTO | * | |
| RICO; COOPERATIVA DE SEGUROS MULTIPLES | * | RE: CIVIL |
| RICO DE PUERTO RICO; INTEGRAND ASSURANCE | * | CLASS ACTION |
| COMPANY; MAPFRE-PRAICO; NATIONAL | * | |
| INSURANCE COMPANY; OPTIMA INSURANCE | * | PLAINTIFFS |
| COMPANY; REAL LEGACY ASSURANCE COMPANY, | * | DEMAND |
| INC.; ROYAL & SUN ALLIANCE OF PUERTO | * | TRIAL BY |
| RICO, INC.; SEGUROS TRIPLE-S PROPIEDAD | * | JURY |
| INC.; UNIVERSAL INSURANCE COMPANY; | * | |
| ALLSTATE INSURANCE COMPANY; GENERAL | * | |
| ACCIDENT INSURANCE COMPANY; NATIONWIDE | * | |
| MUTUAL INSURANCE COMPANY; INSURANCE | * | |
| COMMISSIONER OF THE COMMONWEALTH OF | * | |
| PUERTO RICO, RAMÓN L. CRUZ-COLÓN, in | * | |
| his official capacity; SECRETARY OF THE | * | |
| DEPARTMENT OF TRANSPORTATION AND PUBLIC | * | |
| WORKS, RUBEN A. HERNANDEZ GREGORAT, in | * | |
| his official capacity; and, SECRETARY | * | |
| OF THE DEPARTMENT OF THE TREASURY of | * | |
| the COMMONWEALTH OF PUERTO RICO, JESUS | * | |
| F. MENDEZ, in his official capacity, | * | |
| | * | |
| Defendants. | * | |

**************************************

**PLAINTIFFS' CLASS ACTION COMPLAINT**

## INDEX

|  | Page(s) |
|---|---|
| I. NATURE OF THE ACTION | 1-4 |
| II. JURISDICTION AND VENUE | 4-5 |
| III. PARTIES | 5-17 |
|     A. PLAINTIFFS AND CLASS DEFINITION | 5-7 |
|     B. THE DEFENDANTS | 7-17 |
| IV. ASSOCIATED IN FACT INDIVIDUALS | 17-19 |
| V. OTHER PARTICIPANT INDIVIDUALS | 19 |
| VI. THE COMPULSORY LIABILITY INSURANCE SYSTEM | 19-27 |
| VII. DEFENDANTS' SCHEME TO DEFRAUD | 28-30 |
| VIII. THE ENTERPRISE | 30-32 |
| IX. COMMON FACTUAL ALLEGATIONS | 32-49 |
| X. THE PREDICATE ACTS | 50-51 |
| XI. THE PATTERN OF RACKETEERING ACTIVITY | 51-52 |
| XII. CLASS ALLEGATIONS | 53-59 |
| XIII. LAW VIOLATIONS IN FURTHERANCE OF THE SCHEME TO DEFRAUD | 59-76 |
|     COUNT I — VIOLATIONS TO SECTION 1962(c) OF RICO | 59-65 |
|         A. THE ENTERPRISE | 59-61 |
|         B. RACKETEERING PREDICATE ACTS | 61-63 |
|         C. THE INJURY BY REASON OF THE VIOLATION OF SECTION 1962(c) | 63-65 |
|     COUNT II — VIOLATIONS TO SECTION 1962(a) OF RICO | 65-70 |
|         A. THE ENTERPRISE | 65 |
|         B. THE RACKETEERING INCOME | 65-68 |
|  | Page(s) |

C. THE INJURY BY REASON OF THE
    VIOLATION OF SECTION 1962(a)          68–70

COUNT III — VIOLATIONS TO SECTION
1962(d) OF RICO                            70–72

    A. THE ENTERPRISE                      70

    B. THE CONSPIRACY                      70–71

    C. THE INJURY BY REASON OF THE
        VIOLATION OF SECTION 1962(d)       71–72

COUNT IV — THE INSURANCE CODE VIOLATIONS   73–75

COUNT V — DECEIT ("DOLO") IN THE
FULFILLMENT OF CONTRACTUAL OBLIGATIONS      75–76

XIV. PERMANENT INJUNCTION AND
DECLARATORY JUDGMENT                        76–78

XV. PRAYER FOR RELIEF                        78

**TO THE HONORABLE COURT:**

Plaintiffs, by through the undersigned counsels, very respectfully state, allege, and request:

## I. NATURE OF THE ACTION

1.1 The present litigation is a class action of motor vehicle owners, pursuant to *Title IX of the Organized Crime Control Act of 1970*, otherwise known as *Racketeer Influenced and Corrupt Organizations Act* (henceforth "*RICO*"), as well as the provisions of *Rule 23 of Federal Civil Procedure*, in which the Representative Plaintiffs, on behalf of the Class, request that the Defendants return to the owners of motor vehicles those portions of the annual dollar-premium collected from them when they acquired the policies of the compulsory liability insurance established by law, and which were withheld and misappropriated by the Defendants, in violation to the Puerto Rico Insurance Code.

1.2 The Representative Plaintiffs were insured under *the Compulsory Motor Vehicle Liability Insurance Act, Law 253 of December 27, 1995, codified at 26 P.R. Laws Ann. §§ 8051 et seq.* (henceforth "*Law 253*"), which came into effect on January 1, 1998. They had to pay either a premium of $99.00 for a private unit or a premium of $148 for a commercial unit, which are uniform, the same as approximately the other 2,400,000 owners of private and commercial motor vehicles in Puerto Rico.

1.3   The Defendants, the entity created by *Law 253* and the individual insurance companies that comprise it, taking advantage of their interlocking directorships, conspired and agreed with each other to engage, and did in fact engage, in millions of predicate acts of mail fraud, in violation of RICO, *18 U.S.C. §§ 1341, 1962,* as part of a scheme to defraud and obtain money from Puerto Rican motor vehicle owners.

1.4   The Defendants devised a scheme or artifice to defraud whereby they charged all Puerto Rican motor vehicle owners an 8% of the dollar premium by concept of an "acquisition cost" for services of brokers that they knew were not going to be used by the insured, plus an amount estimated in 4% of the dollar premium by concept of an "administrative cost" for the issuance of paper copies of policies, which they never intended to issue to the insured. The Defendants, thereafter, failed to reimburse to the motor vehicle owners the price they had unknowingly paid for such non-incurred charges, hidden in the annual insurance premium rate, amounting to 12% of its cost. Instead, the Defendants embezzled such funds for their own pecuniary benefit.

1.5   The collection of the acquisition and administrative costs, without the corresponding refund or return of the portion of the premium not incurred as costs constitutes illegal dealing in premiums prohibited by the dispositions of the Puerto Rico Insurance Code.

2

1.6 The illegal retention and embezzlement by the Defendants of the portion of the premium or charge for insurance in excess of the amount spent resulted in million of dollars of illegal gains for them.

1.7 From the year 1998 to the present, in furtherance of the scheme to defraud Puerto Rican motor vehicle owners, the Defendants caused, and continue to cause, the United States mails to be used to send millions of licenses or registrations to the over 2,400,000 motor vehicle owners, which contained the charges for the payment of the compulsory insurance policy. Each of these mailings is an act that is indictable as mail fraud and together they constitute a pattern of racketeering activity. By conspiring to conduct, and in fact conducting, the affairs of their ENTERPRISE, as defined hereunder, through this pattern of racketeering activity, the Defendants violated *RICO*, *18 U.S.C. § 1962(c) & (d).* As result, the Representative Plaintiffs and the Class Members were injured in their property.

1.8 Furthermore, the insurer created by *Law 253* transmitted, by means of interstate wire, racketeering proceeds gained from the scheme to defraud to a financial institution in Chicago, Illinois. Each of these wire transfers is a predicate act that is indictable as wire fraud, under *18 U.S.C. § 1343,* and together they constitute a separate and distinct pattern of racketeering activity. This insurer then used or invested income

3

received from both patterns of racketeering activity respectively comprised of predicate acts of mail or wire fraud, in its business operations, in order to further engage in illegal dealing in premiums, in violation of *RICO, 18 U.S.C. § 1962(a).* As result, the Representative Plaintiffs and the Class Members continued to be injured in their property.

1.9  Moreover, the Representative Plaintiffs are requesting declaratory and injunctive relief. A declaratory judgment and permanent injunction will guarantee that the Defendants and all parties cease and permanently desist from engaging in illegal dealings in premiums as to the Representative Plaintiffs and the Class Members regarding the costs for brokerage services and paper copies of policies, in violation of the applicable laws, statutes and regulations. Such relief will also ensure that the Puerto Rico Insurance Commissioner, the Secretary of the Puerto Rico Department of Transportation and Public Works and the Secretary of the Treasury Department do not acquiesce to the Defendants' conduct.

1.10 Pursuant to the Seventh Amendment of the United States Constitution, the Representative Plaintiffs demand a trial by jury in the instant case. *Fed. R. Civ. P. 38b.*

## II. JURISDICTION AND VENUE

2.1  This Honorable Court has jurisdiction over this civil action pursuant to *28 U.S.C. § 1331*, this being a civil action

4

which arises under *18 U.S.C. §§ 1961-1968, 901(a) of RICO*, and in particular, under *18 U.S.C. § 1964*.

2.2  Venue is proper in the instant case as all claims arise from events that have occurred and are occurring within the jurisdiction of this Court in the Commonwealth of Puerto Rico.

2.3  The Representative Plaintiffs further invoke the supplemental jurisdiction of this Court to hear and adjudicate claims arising under the laws of the Commonwealth of Puerto Rico, specifically, under *Article 27.160 of the Puerto Rico Insurance Code, 26 P.R. Laws Ann. § 2716, Articles 1054 and 1060 of the Puerto Rico Civil Code, 31 P.R. Laws Ann. §§ 3018, 3024,* and *Act No. 118 of June 25, 1971, 32 P.R. Laws Ann. § 3341*, since they are so related to the afore stated federal claims that they all form part of the same case or controversy under Article III of the Constitution of the United States.

2.4  Pursuant to *Rule 65(b) of the Federal Rules of Civil Procedure*, this Court has jurisdiction to issue a Permanent Injunction.

### III. PARTIES

**A. PLAINTIFFS AND CLASS DEFINITION:**

3.1  The individual Plaintiffs and Class Members represent two Classes of Plaintiffs.

3.2   The First Class of Plaintiffs is defined as all private motor vehicle owners in the Commonwealth of Puerto Rico, who in compliance with the Compulsory Motor Vehicle Liability Insurance Act, acquired compulsory insurance during the years 1998 to the present, paying the uniform annual premium of $99.00 (henceforth referred to as the "Private-Vehicle Class").

3.3   The Plaintiff Representative, who appears on her own behalf, and on behalf and for the benefit of all other members of the Private-Vehicle Class, is **NOEMI TORRES RONDA**, married, resident of Cabo Rojo, Puerto Rico, and owner of the motor vehicle model Mirage, make Mitsubishi, year 1998, and license plate CZM631.

3.4   The Second Class of Plaintiffs is defined as all commercial motor vehicle owners in the Commonwealth of Puerto Rico, who in compliance with the Compulsory Motor Vehicle Liability Insurance Act, acquired compulsory insurance during the years 1998 to the present, paying the uniform annual premium of $148.00 (henceforth referred to as the "Commercial-Vehicle Class").

3.5   The Plaintiff Representative, who appear on his own behalf, and on behalf and for the benefit of all other members of the Commercial-Vehicle Class, is **ANGELO RIVERA LAMBOY,** married, resident of Aibonito, Puerto Rico, and owner of the motor

6

vehicle model F150, make Ford, year 1997, and license plate 795770.

3.6 Excluded from the Private-Vehicle and Commercial-Vehicle Classes are: Defendants; Defendants' employees, co-conspirators, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees; the Judge and judicial officers and their immediate family members and associated court staff assigned to this case; and, all persons within the third degree of relationship to any such persons.

3.7 The Plaintiffs have learned of the facts object of the present action within the four years prior to the filing of the present complaint. Moreover, as a result of the Defendants' fraudulent concealment, the applicable statutes of limitations have been tolled or have not yet begun to run.

**B. THE DEFENDANTS:**

3.8 The Defendants are: the **JOINT UNDERWRITING ASSOCIATION** or, in Spanish, *"Asociación de Suscripción Conjunta De Seguro De Responsabilidad Obligatorio"* ("**JUA**"); **CARIBBEAN ALLIANCE INSURANCE COMPANY** ("**CAICO**"); **CHARTIS INSURANCE CO., OF PUERTO RICO** ("**CHARTIS**"), formerly known as **AMERICAN INTERNATIONAL INSURANCE COMPANY OF PUERTO RICO** ("**AIG**"); **COOPERATIVA DE SEGUROS MULTIPLES DE PUERTO RICO** ("**COOPERATIVA**"); **INTEGRAND ASSURANCE COMPANY** ("**INTEGRAND**"); **MAPFRE-PRAICO**, formerly known as **PUERTO**

7

RICO AMERICAN INSURANCE COMPANY ("PRAICO"); NATIONAL INSURANCE COMPANY ("NATIONAL"); OPTIMA INSURANCE COMPANY ("OPTIMA"); REAL LEGACY ASSURANCE COMPANY, INCORPORATED ("REAL LEGACY"); ROYAL & SUN ALLIANCE OF PUERTO RICO, INCORPORATED ("ROYAL & SUN"); SEGUROS TRIPLE-S PROPIEDAD, INCORPORATED ("TRIPLE-S"); UNIVERSAL INSURANCE COMPANY ("UNIVERSAL"); MAPFRE PREFERRED RISK INSURANCE COMPANY, formerly know as PREFERRED RISK INSURANCE COMPANY ("PREFERRED RISK"); ALLSTATE INSURANCE COMPANY ("ALLSTATE"); GENERAL ACCIDENT INSURANCE COMPANY ("GENERAL ACCIDENT"); NATIONWIDE MUTUAL INSURANCE COMPANY ("NATIONWIDE"); the Insurance Commissioner of the Commonwealth of Puerto Rico, RAMON L. CRUZ-COLON ("CRUZ-COLON"); the Secretary of the Department of Transportation and Public Works, RUBEN A. HERNANDEZ-GREGORAT ("HERNANDEZ-GREGORAT"); and, the Secretary of the Department of the Treasury of the Commonwealth of Puerto Rico, JESUS F. MENDEZ ("MENDEZ").

3.9  The JUA was created by *Law 253* as a private legal entity, for profit, and with "general corporate powers," such as the faculties to sue and be sued. *See, 26 P.R. Laws Ann. §§ 8055(A), §2905.*

3.10 The JUA is composed of all "private insurers" whose volume of premiums underwritten for motor vehicle liability insurance is greater than one percent (1%) of the total volume of motor vehicle liability insurance premiums underwritten in

8

Puerto Rico. *26 P.R. Laws Ann., § 8052(b)*. Presently, these insurance companies are **CAICO, CHARTIS, COOPERATIVA, INTEGRAND, MAPFRE—PRAICO, NATIONAL, OPTIMA, REAL LEGACY, TRIPLE-S** and **UNIVERSAL.** In the past, at some point or another in time, **AIG** (now known as **CHARTIS), PRAICO** (now known as **MAPFRE—PRAICO), ROYAL & SUN, PREFERRED RISK, ALLSTATE, GENERAL ACCIDENT** and **NATIONWIDE** also formed part of the **JUA.**

3.11 At all times relevant herein, **CAICO, CHARTIS, COOPERATIVA, INTEGRAND, MAPFRE—PRAICO, NATIONAL, OPTIMA, REAL LEGACY, TRIPLE-S, UNIVERSAL, AIG, PRAICO, ROYAL & SUN, PREFERRED RISK, ALLSTATE, GENERAL ACCIDENT** and **NATIONWIDE** (henceforth collectively referred to as "traditional insurers") were incorporated or organized under the laws of, and with their principal places of business in, the Commonwealth of Puerto Rico, where they were authorized to conduct, as they conducted, the business of insurance.

3.12 Since its creation, the **JUA's** Board of Directors, by law, was to be comprised of five Directors. The members of the **JUA** elected four Directors, while the fifth Director was the officer in charge of the **JUA.** In the year 2002, the number of members of the **JUA's** Board of Directors was increased by law to seven, of which three were to be appointed by the Governor of the Commonwealth of Puerto Rico and the remaining four are members the **JUA.** However, the Governor, as mandated by law,

9

never appointed the three additional directors of the **JUA**. The 2009 amendment to *Law 253* provided that the three governmental appointees cannot be public officers and must be knowledgeable of the insurance market. *26 P.R. Laws Ann. § 8055(f).*

3.13 The Board of Directors of the **JUA**, since its creation in December 27, 1995, and up to the present, has served as a conduit for the ENTERPRISE'S fraudulent objectives, by which the interlocking directors of the **JUA** and the traditional insurer members of such ENTERPRISE, jointly with other individuals, knowingly, intentionally and unlawfully, have met, planned, devised, organized, and assisted in the adoption and implementation of part, or all, of the fraudulent artifices that form part of the Scheme to Defraud defined herein after.

3.14 In the years 1996 and 1997, the Board of Directors of the **JUA** was comprised of the following individuals: **Juan Antonio Terrassa ("Terrassa")**, President, and also, President of the Board of Directors of **PRAICO; Luis Miranda-Casañas ("Miranda-Casañas")**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL; Edwin Quiñones ("Quiñones")**, Director, and also, President of the Board of Directors of **COOPERATIVA; Dennis Hanftwurzel ("Hanftwurzel")**, Director, and also, President of the Board of Directors of **GENERAL ACCIDENT; Hilda Rodriguez-Forteza, Esq. ("Rodriguez-Forteza")**; and, **Alberto Rodriguez, Esq.("Rodriguez**).

10

3.15 In the year 1998, the Board of Directors of the **JUA** was comprised of the following individuals: **Terrassa**, President, and also, President of the Board of Directors of **PRAICO**; **Miranda-Casañas**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL**; **Adrian Ortiz** (**"Ortiz"**), Executive Director; **Quiñones**, Director, and also, President of the Board of Directors of **COOPERATIVA**; **Rodriguez-Forteza**; and, **Rodriguez.**

3.16 In the year 1999, the Board of Directors of the **JUA** was comprised of the following individuals: **Terrassa**, President, and also, President of the Board of Directors of **PRAICO**; **Miranda-Casañas**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL**; **Ortiz**, Executive Director; **Quiñones**, Director, and also, President of the Board of Directors of **COOPERATIVA**; **Patricia Gonya** (**"Gonya"**), Director, and also, Director of the Board of **NATIONWIDE**; **Rodriguez-Forteza**; and, **Rodriguez.**

3.17 In the year 2000, the Board of Directors of the **JUA** was comprised of the following individuals: **Terrassa**, President, and also, President of the Board of Directors of **PRAICO**; **Miranda-Casañas**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL**; **Ortiz**, Executive Director; **Quiñones**, Director, and also, President of the Board of

11

Directors of **COOPERATIVA; Gonya**, Director, and also, Director of the Board of **NATIONWIDE; Rodriguez-Forteza;** and, **Rodriguez.**

3.18 In the year 2001, the Board of Directors of the **JUA** was comprised of the following individuals: **Terrassa**, President, and also, President of the Board of Directors of **PRAICO; Miranda-Casañas**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL; Rene Campos** ("**Campos**"), Director, and also, President of the Board of Directors of **COOPERATIVA; Victor Salgado-Micheo** ("**Salgado-Micheo**"), Director, and also, Director of the Board of **INTEGRAND.**

3.19 In the year 2002, the Board of Directors of the **JUA** was comprised of the following individuals: **Campos**, President, and also, President of the Board of Directors of **COOPERATIVA; Miranda-Casañas**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL; Salgado-Micheo**, Director, and also, Director of the Board of **INTEGRAND;** and, **Antonio Huertas** ("**Huertas**"), Director, and also President of the Board of Directors of **PRAICO.**

3.20 In the year 2003, the Board of Directors of the **JUA** was comprised of the following individuals: **Campos**, President, and also, President of the Board of Directors of **COOPERATIVA; Salgado-Micheo**, Vice-President, and also, President of the Board of Directors of **INTEGRAND; Miranda-Casañas**, Director, and also, President of the Board of Directors of **UNIVERSAL;** and, **Huertas,**

12

Director, and also President of the Board of Directors of **PRAICO**.

3.21 In the year 2004, the Board of Directors of the **JUA** was comprised of the following individuals: **Campos**, President, and also, President of the Board of Directors of **COOPERATIVA**; **Miranda-Casañas**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL**; **Salgado-Micheo**, Director, and also, President of the Board of Directors of **INTEGRAND**; and, **Raul Costilla** ("**Costilla**"), Director, and also, President of the Board of Directors of **PRAICO**.

3.22 In the year 2005, the Board of Directors of the **JUA** was comprised of the following individuals: **Miranda-Casañas**, President, and also, President of the Board of Directors of **UNIVERSAL**; **Salgado-Micheo**, Vice-President, and also, President of the Board of Directors of **INTEGRAND**; **Campos**, Director, and also, President of the Board of Directors of **COOPERATIVA**; and, **Costilla**, Director, and also, President of the Board of Directors of **PRAICO**.

3.23 In the year 2006, the Board of Directors of the **JUA** was comprised of the following individuals: **Victor Rios** ("**Rios**"), President, and also, President of the Board of Directors of **REAL LEGACY**; **Eva Salgado** ("**Salgado**"), Vice-President, and also, President of the Board of Directors of **TRIPLE-S**; **Costilla**, Director, and also, President of the Board

13

of Directors of **PRAICO;** and, **Francisco Diaz**, Director, and also, President of the Board of Directors of **AIG,** now **CHARTIS.**

3.24 In the year 2007, the Board of Directors of the **JUA** was comprised of the following individuals: **Miranda-Casañas,** President, and also, President of the Board of Directors of **UNIVERSAL; Salgado-Micheo,** Vice-President, and also, President of the Board of Directors of **INTEGRAND; Campos**, Director, and also, President of the Board of Directors of **COOPERATIVA;** and, **Costilla,** Director, and also, President of the Board of Directors of **PRAICO.**

3.25 In the year 2008, the Board of Directors of the **JUA** was comprised of the following individuals: **Rios,** President, and also, President of the Board of Directors of **REAL LEGACY; Luis Berrios** (**"Berrios"**), Vice-President, and also, President of the Board of Directors of **UNIVERSAL; Salgado,** Director, and also, President of the Board of Directors of **TRIPLE-S;** and, **Costilla,** Director, and also, President of the Board of Directors of **MAPFRE-PRAICO.**

3.26 In the year 2009, the Board of Directors of the **JUA** was comprised of the following individuals: **Rios,** President, and also, President of the Board of Directors of **REAL LEGACY; Berrios**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL; Salgado,** Director, and also, President

14

of the Board of Directors of **TRIPLE-S**; and, **Costilla**, Director, and also, President of the Board of Directors of **PRAICO.**

3.27 In the year 2010, the Board of Directors of the **JUA** was comprised of the following individuals: **Rios**, President, and also, President of the Board of Directors of **REAL LEGACY**; **Monique Miranda**, Vice-President, and also, President of the Board of Directors of **UNIVERSAL**; **Salgado**, Director, and also, President of the Board of Directors of **TRIPLE-S**; **Costilla**, Director, and also, President of the Board of Directors of **MAPFRE—PRAICO**; **Eduardo R Emanuelli**; **Terrassa**; and, **Angel M Cintrón.**

3.28 The Defendants, either on their own or through their agents, are currently found in, and/or transact business within, the Commonwealth of Puerto Rico, and/or at the time of the commission of the acts alleged hereunder were found in, and/or transacted business within the Commonwealth of Puerto Rico, and the cause of action which is the object of this complaint arises out of those business transactions in the Commonwealth of Puerto Rico.

3.29 At all times relevant herein, the Defendants, on their own or through their agents or employees, have knowingly, intentionally and unlawfully, aided and abetted and conspired with the other members of the ENTERPRISE defined hereunder to commit within the Commonwealth of Puerto Rico the wrongful acts

15

alleged in this complaint and/or committed or participated in the commission of those acts within or outside the Commonwealth of Puerto Rico, purposefully directing their wrongful acts toward the forum of Puerto Rico, causing in Puerto Rico, directly or indirectly, the violations of *RICO* and the injuries sustained by the Representative Plaintiffs and Class Members.

3.30 Each of the Defendants, individually, and through its association-in-fact with the other Defendants (the ENTERPRISE), is or has been engaged in, or its activities affect or have affected, interstate commerce.

3.31 Defendants' racketeering activities were conducted through a pattern of acts and transactions, which occurred and/or had their effect within the Commonwealth of Puerto Rico.

3.32 **CRUZ-COLON**, as Insurance Commissioner, sets the terms of the compulsory liability insurance policy, the premium rate, and the amount of coverage. By statute, the Insurance Commissioner is directed to establish the manner of distribution of the total amount of premiums received by the **JUA**, the structure and operation of the **JUA**, and its direction by its Board of Directors, so that the **JUA** may accomplish its goals in a "cost-effective, fair and nondiscriminatory" manner; and, he has considerable supervision over the operating plan and the method of premium distribution. *26 P.R. Laws Ann., §§ 8055,*

16

*8056.* **CRUZ-COLON** is sued in his *official capacity only* for purposes of the implementation of injunctive relief.

3.33 **HERNANDEZ-GREGORAT** oversees and administers the operations of the Department of Transportation and Public Works ("DTPW"), which issues and mails, via the U.S. Postal Service, the motor vehicle registration, which includes the annual premium for the compulsory liability insurance policy, to each motor vehicle owner. By statute, the Secretary of the DTPW is directed to provide to the **JUA** all relevant information regarding the insured motor vehicle owners and the payment of the license stickers. *26 P.R. Laws Ann., § 8055.* **HERNANDEZ-GREGORAT** is sued in his *official capacity only* for purposes of the implementation of injunctive relief.

3.34 **MENDEZ** oversees and administers the operations of the Department of the Treasury ("Treasury"), which collects the premium for the compulsory liability insurance paid by each motor vehicle owner at the time he/she acquires or renews the motor vehicle's license. *26 P.R. Laws Ann., §§ 8051, 8053(a).* The Secretary of the Treasury then turns over the total amount of the premiums so received to the **JUA.** *Id., § 8055(c).* **MENDEZ** is sued in his *official capacity only* for purposes of the implementation of injunctive relief.

17

## IV. ASSOCIATED IN FACT INDIVIDUALS

4.1 **Juan A. Garcia** ("**Garcia**") is the former Insurance Commissioner of the Commonwealth of Puerto Rico, for the period covering 1993 to 2001. As such, he knowingly, intentionally and unlawfully, aided and abetted and conspired with the members of the ENTERPRISE in approving premium rates, rules and regulations that were used in carrying out the Scheme to Defraud described hereunder.

4.2 **CRUZ-COLON** was the Assistant to the Insurance Commissioner **Garcia**, for the period covering 1993 to 2001. As such, he knowingly, intentionally and unlawfully, aided and abetted and conspired with the members of the ENTERPRISE in furtherance of the Scheme to Defraud described hereunder.

4.3 **Ortiz** held the position of President of the **JUA**, in the years 1997 to 2000, and was member of its Board of Directors, in the years 1998, 1999 and 2000. He knowingly, intentionally and unlawfully, planned, devised and concocted the fraudulent artifices that form part of the Scheme to Defraud defined hereunder, and aided and abetted and conspired with the members of the ENTERPRISE in furtherance thereof.

4.4 **Miranda-Casañas** was a member of the Board of Directors of the **JUA**, in the years 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005 and 2007. He knowingly, intentionally and unlawfully, planned, devised and concocted the fraudulent

18

artifices that form part of the Scheme to Defraud defined hereunder, and aided and abetted and conspired with the members of the ENTERPRISE in furtherance thereof.

4.5 **Terrassa** was a member of the Board of Directors of the **JUA**, in the years 1996, 1997, 1998, 1999, 2000, 2001 and 2010. He knowingly, intentionally and unlawfully, planned, devised and concocted the fraudulent artifices that form part of the Scheme to Defraud defined hereunder, and aided and abetted and conspired with the members of the ENTERPRISE in furtherance thereof.

### V. OTHER PARTICIPANT INDIVIDUALS

5. The Insurance Commissioners of the Commonwealth of Puerto Rico, for the period covering from 2001, and up to the present time, were either willfully blind, and/or knowingly, intentionally and unlawfully, aided and abetted and conspired with the other members of the ENTERPRISE in allowing the perpetuation of the Scheme to Defraud defined hereunder.

### VI. THE COMPULSORY LIABILITY INSURANCE SYSTEM

6.1 Before the enactment of *Law 253*, uninsured drivers caused over $110 million in damages to other vehicles each year in Puerto Rico, and it was estimated that only 25 percent to 30 percent of the vehicles in Puerto Rico were covered under some type of liability insurance.

19

6.2  In view of the problem of financial loss as a result of uncompensated damages to motor vehicles in traffic accidents, *Law 253* created a compulsory automobile liability insurance system, which covers the damages caused to other motor vehicles in such accidents. To such ends, *Law 253* requires every motor vehicle owner in Puerto Rico to obtain and keep a liability insurance coverage in effect to respond for damages caused by said individual to motor vehicles of third parties in a traffic accident. *26 P.R. Laws Ann., § 8051.*

6.3  Beginning in the year 1998, this compulsory insurance system provided each insured motor vehicle owner with $3,000 of coverage for damages caused to another motor vehicle per accident in exchange for a uniform premium, set at $99 for each private passenger vehicle and $148 for each commercial vehicle. *26 P.R. Laws Ann., §§ 8052(j) and 8056(a)).* In the year 2009, the coverage of the compulsory insurance was increased to a $4,000 limit per accident. *26 P.R. Laws Ann., § 8052(k).*

6.4  *Law 253* allows the motor vehicle owners to obtain the compulsory coverage through the traditional insurers or through the **JUA.** The traditional insurers are required by law to offer the compulsory liability insurance in two ways: both as traditional insurers to a defined class of drivers and as members of the **JUA**, to which they belong. *26 P.R. Laws Ann. §§ 8053(d), 8054(a), 8055(a). Law 253* allows the traditional

20

insurers to reject certain applicants for the compulsory insurance, pursuant to regulations promulgated by the Insurance Commissioner. *Id., § 8054(b)*. The criteria for rejection are defined by the *Insurance Commissioner's Puerto Rican Insurance Rule LXX* ("*Rule LXX*"), promulgated in *Regulation No. 6254*, in December of 2000. Most of the criteria in *Rule LXX* for permissible rejections identify applicants who are bad drivers or otherwise of high risk. *Rule LXX, Art. 8.*

6.5   *Law 253* created the **JUA** as a residual market insurer to provide insurance coverage to the high-risk drivers rejected by the traditional insurers, *26 P.R. Laws Ann. § 8055(b),* which were originally calculated to be around 3% of the applicants.

6.6   *Law 253* allows motor vehicle owners to opt out of the compulsory liability insurance scheme by purchasing traditional liability insurance with comparable or better coverage. *Id., § 8061; Rule LXX, Art. 12(a).*

6.7   *Law 253* requires the traditional insurers to offer the policy despite the availability of coverage from the **JUA**, *26 P.R. Laws Ann. §§ 8054(a), 8055(b)*, and allows them to apply for approval and to sell the compulsory insurance at less than the rate set by the Commonwealth, *id. § 8056(c)*. The legislative history suggests that *Law 253* was meant to encourage competition "between insurance companies wanting to have a greater number of insured, which will have to extend offers in order to attract

them." *Daily Sessions Record, Senate of Puerto Rico, Monday, October 9, 1995*. As a result, the statutory scheme contemplated competition in compulsory insurance for non-high-risk drivers between traditional insurers themselves and between them and the **JUA**. *See, Arroyo-Melecio v. Puerto Rican Am. Ins. Co.,* 398 F.3d 56, 60 (1st Cir. 2005).

6.8 The DTPW is in charge of the billing for the compulsory liability insurance. To that effect, the DTPW places in the post offices or authorized depositories for mail matter, the registrations for all motor vehicles in Puerto Rico, containing the annual premium for the compulsory insurance policy, which are then delivered, by the U.S. Postal Service, to the motor vehicles owners.

6.9 Each vehicle owner must pay the premium for the compulsory liability insurance to the Secretary of the Treasury at the time he acquires or renews the vehicle's license. *26 P.R. Laws Ann., §§ 8051, 8053(a)*. The Secretary then turns over the total amount of the premiums so received to the **JUA**, which is then responsible for distributing the premiums among its members and itself, as the case may be. *Id., § 8055(c); Rule LXX, Art. 19.*

6.10 The motor vehicle registration stamped as paid constitutes evidence of compliance with the compulsory liability insurance system.

22

6.11 Every motor vehicle for which the requisite compulsory liability insurance premium has been paid is considered to be insured by the **JUA**, unless the owner of the same has selected a traditional insurer or purchased a traditional insurance policy. *See, Rule LXX, Art. 12(a).*

6.12 When the owner of the motor vehicle had traditional liability insurance in effect at the time of the issuance or renewal of the license, the **JUA** was supposed to issue a check payable to the Secretary of the Treasury to be used by such insured to pay for the compulsory liability insurance premium; but, in reality, the practice was that the insured paid such premium to the Secretary of the Treasury at the moment of issuance or renewal of the license and could thereafter seek a credit of that premium to his traditional insurance premium from his insurer. *Rule LXX, Art 10(a); 26 P.R. Laws Ann., § 8061(b).*

6.13 The 2009 amendment to *Law 253* requires the traditional insurer to issue to its insured a certification authorized by the **JUA** as evidence of compliance with the compulsory liability insurance, which the motor vehicle owner may present to the Secretary of the Treasury to avoid making duplicate compulsory premium insurance payments. *26 P.R. Laws Ann., § 8061(b).* When the motor vehicle owner pays the compulsory insurance premium directly to the Secretary of the Treasury, which is usually the case, the traditional insurer then credits in the premiums

23

charged to the insured for the traditional liability insurance the amount of the payment received from the Secretary of the Treasury in compliance with the provisions of *Law 253. Id.*

6.14 All members of the **JUA** share in its profits and losses. *26 P.R. Laws Ann. § 8055(e)*. To compensate for the fact that the **JUA** would supposedly insure drivers considered to be high risk by traditional insurers, all the **JUA's** profits, including those distributed to the traditional insurers, were originally exempt from income taxes, until the law was amended on September 24, 2002. But the 2009 amendment reestablished the tax exemption when the profits are deposited in governmental banks ("Banco Gubernamental de Fomento" or "Banco de Desarrollo Economico"). *Id., § 8055*. Through the **JUA**, the risk of insuring these high-risk drivers was supposed to be spread among all the traditional insurers. The profits distributed to the **JUA** members (the traditional insurers) also encompass the profits from the sale of non-high-risk policies insured by the **JUA**. *See, Arroyo-Melecio,* 398 F.3d, at 62.

6.15 For both the traditional insurers and the **JUA**, the Commonwealth, through the Insurance Commissioner, sets the terms of the compulsory policy itself, the premium rate, and the amount of coverage.

6.16 The Puerto Rico Mandatory Liability Insurance Uniform Policy, the policy defining the terms of the compulsory

24

liability insurance, is set forth in the Insurance Commissioner's rules. *Rule LXX, Art. 22.* This Uniform Policy is the sole written contract between the insured and the **JUA**. *Id. Law 253* provides that such Uniform Policy shall be subject to the provisions of *Chapter 11 of Title 26 of Puerto Rico Laws Annotated. 26 P.R. Laws Ann § 8054(c). Chapter 11,* in turn, requires the issuance of a paper policy to the insured. *26 P.R. Laws Ann § 1114.* In reality, however, a paper copy of the Uniform Policy is not issued to the insured.

6.17 In *Arroyo-Melecio*, the First Circuit squarely held that, while created by law, the **JUA** is "private in nature, for profit, and ... subject to the provisions of the [Insurance] Code applicable to insurers." 398 F.3d, at 62, *quoting Rule LXX, Art. 2(c). See, also, Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza,* 484 F.3d 1, 20 (1st Cir. 2007) (same).

6.18 The provisions of the Puerto Rico Insurance Code relevant to the facts object of this action are listed below.

> A. *Article 3.290*, which requires that all insurance business be transacted through resident authorized agents or broker producers, in its relevant part, states the following:
>
> (1) No insurer may effectuate any direct insurance upon or relative to any person, property or other material object of insurance that resides, is located in or is to be carried out in Puerto Rico, nor any insurance related thereto, except through an

authorized representative of said insurer residing in
Puerto Rico.

*26 P.R. Laws Ann. § 329(a).*

B. *Article 11.14* requiring the issuance of an insurance
policy and specifying its contents, in its relevant
part, states the following:

(1) The written instrument in which a contract of
insurance is set forth is the policy.

(3) The policy shall specify:

(a) The names of the parties to the contract, and the
status of any party where such status is material
to the contract. The policy shall be headed by
the insurer's name.

(b) The subject of the insurance.

(c) The hazards insured against.

(d) The amount of the insurance and benefits.

(e) The time at which the insurance thereunder takes
effect and the period during which the insurance
is to continue.

(f) A statement of the premium, and the premium rate
if other than life, disability, or title
insurance. ... .

(g) The conditions pertaining to the insurance.

*26 P.R. Laws Ann § 1114.*

C. *Article 27.160* regarding illegal dealing in premiums,
which reads, in its relevant part, as follows:

(2) No person shall collect as premium or charge for
insurance any sum in excess of the amount actually
expended or in due course to be expended for insurance
applicable to the subject on account of which the
premium was collected or charged.

26

(3) Any sum collected as premium or charge for insurance in excess of the amount actually expended for insurance or for medical examination in the case of life insurance, applicable to the subject on account of which the premium or charge was collected shall be returned to the person entitled thereto within thirty (30) days from the date in which it is requested, and if not requested, within the term of ninety (90) days.

Any person who fails to return said sums within the term set forth in this subsection shall be bound to pay legal interest on the amount to be returned.

*26 P.R. Laws Ann. § 2716(2)-(3).*

6.19 The OIC's Interpretive Rulings of *Article 27.160,* regarding the charging of broker's fees for insurance coverage, provides that in such cases where a broker is not used -- as the exception to the rule requiring that all policies be transacted through brokers (*Article 3.290*) -- the charging of broker's fees would violate *Article 27.160*.

6.20 On April 29, 2009, as result of the First Circuit holding in *Flores Galarza, supra*, to the effects that the **JUA** operates as a private enterprise and is, in fact, a private enterprise, and that the premiums collected by concept of compulsory liability insurance are, likewise, of a private nature, the Commonwealth Legislature amended those provisions of *Law 253* affected by such judicial determination *See, Statement of Purposes, Act 347 of April 29, 2009.*

27

## VII. DEFENDANTS' SCHEME TO DEFRAUD

7.1  The Individual Plaintiffs ("Plaintiffs") bring this action on behalf of themselves and two Classes of similarly situated persons ("Class Members") seeking redress for the illegal acts of the Defendants, which have resulted in a loss of their property, and for declaratory and injunctive relief to end those practices and prevent further losses.

7.2  From on or about 1997, and up to the present time, the Defendants herein, at the same or different points in time, knowingly, intentionally and unlawfully, aided and abetted, conspired and associated in fact between themselves, through their ENTERPRISE, to confederate and agree with each other, for the purpose of devising, or intending to devise a scheme or artifice to defraud and to obtain money, by means of false or fraudulent pretenses, representations or promises; and, directly participated in, or aided and abetted, counseled, commanded, induced, procured or caused and conspired in, the perpetration of such scheme to defraud and to obtain money.

7.3 The scheme to defraud and to obtain money consisted in the following:

> a)  Defendants, utilizing the motor vehicle licenses or registrations printed by the DTPW as a conduit to create an appearance of unquestionable legitimacy, billed all Puerto Rican motor vehicle owners for compulsory liability insurance coverage at the time of the issuance or renewal of such licenses or registrations;

28

b)    Defendants willfully and wrongfully charged all motor vehicle owners therein an 8% of the dollar premium by concept of an "acquisition cost" for services of brokers that they very well knew were not going to be used by the insured, plus an amount estimated in 4% of the dollar premium by concept of an "administrative cost" for the issuance of paper copies of policies, which they never intended to issue to the insured; and,

c)    thereafter, Defendants, illegally, unlawfully, knowingly, deliberately and maliciously deprived said motor vehicle owners of their monies, by not reimbursing them the price they paid for such non-incurred costs included in the annual insurance premium rate, amounting to 12% of its cost, thereby embezzling such monies for the pecuniary benefit and economic interest of the members of the ENTERPRISE (the "Scheme to Defraud").

7.4  The Defendants had a statutory duty, under Commonwealth Law, to return to the Puerto Rican motor vehicle owners the costs charged for brokerage services that were not rendered and the costs charged for issuance of policies that were not incurred. *See, 26 P.R. Laws Ann. § 2716(2)-(3)* (Illegal Dealings in Premiums).

7.5  The collection of the acquisition cost and the administrative cost without the corresponding refund of the portion of the premium not incurred constitutes a violation to the provisions of the Puerto Rico Insurance Code. *Id.*

7.6  The use of the mails was an integral and essential part of the Scheme to Defraud since the billing for the

29

compulsory liability insurance was done through the United States Postal Service.

7.7 In furtherance of the Scheme to Defraud, Defendants caused the DTPW to place in the post offices or authorized depositories for mail matter envelopes, containing the motor vehicles licenses or registrations that included the billing for the annual premium for the compulsory insurance policy, which were thereafter delivered, by the United States Postal Service, to all motor vehicles owners in Puerto Rico.

## VIII. THE ENTERPRISE

8.1 At all times relevant herein, the Defendants associated in fact for the common purpose of furthering and engaging in the Scheme to Defraud.

8.2 The ENTERPRISE is an association-in-fact, an entity separate from and bigger than any of the "persons" (the Defendants and other members of the Enterprise) comprising the same; where, at all times relevant herein, these "persons" were systematically linked with overlapping leadership, structural and financial ties, and continuing coordination.

8.3 At all times relevant herein, the ENTERPRISE was composed by the association in fact of the **JUA** and its former or current members, **CAICO, CHARTIS** (formerly **AIG**), **COOPERATIVA, INTEGRAND, MAPFRE—PRAICO** (formerly **PRAICO**), **NATIONAL, OPTIMA, REAL LEGACY, TRIPLE-S, UNIVERSAL, ROYAL & SUN, PREFERRED RISK,**

**ALLSTATE**, **GENERAL ACCIDENT** and **NATIONWIDE**, together with **Garcia**, **CRUZ-COLON**, **Ortiz**, **Miranda-Casañas**, **Terrassa** and other unnamed and yet unknown individuals, partnerships, corporations or associations (the "ENTERPRISE"). It includes the forenamed Defendants and associated individuals, as well as persons who have not violated *RICO*.

8.4 Structurally, the ENTERPRISE is an association comprised of the Defendants and other persons and entities whose common link is the purpose and nature of their business, *i.e.*, selling motor vehicle compulsory liability insurance policies and providing coverage to the insured.

8.5 The association-in-fact Enterprise was a formal legitimate ongoing organization, functioning as a continuing unit, pursuing an interrelated course of conduct, and with a common or shared purpose and continuity of structure and personnel.

8.6 The forenamed Defendants, as members of the ENTERPRISE, used said formal and legitimate association-in-fact ENTERPRISE as an instrument to perpetrate the Scheme to Defraud, through the pattern of racketeering activity, as fully described herein after. The aim of the Scheme to Defraud was the sale of motor vehicle compulsory liability insurance policies fraudulently containing hidden charges for non-incurred costs to derive racketeering income.

31

8.7 The ENTERPRISE is engaged in interstate commerce through the activities of its associates, as described herein before.

## IX. COMMON FACTUAL ALLEGATIONS

9.1 *Law 253* created the **JUA** as a residual market insurer for high-risk drivers who had been rejected by traditional insurance carriers. This statute sought to encourage competition in compulsory liability insurance for non-high-risk drivers between the traditional insurers themselves and between them and the **JUA.** In reality, however, this has not been the practice, and the **JUA** has been selling the compulsory liability insurance to all Puerto Rican drivers. In doing so, the **JUA** changed its nature as a residual insurer to a primary insurer and monopolized this market, which has facilitated the execution of the Scheme to Defraud.

9.2 Prior to January 1, 1998, when *Law 253* would be in effect, the Office of the Insurance Commissioner ("OIC") commissioned an advisory or technical committee ("TC") from different sectors of the local insurance community, in order to rollout and implement *Law 253*.

9.3 Membership of the TC included, among others: **PRAICO** (now known as **MAPFRE—PRAICO**), **GENERAL ACCIDENT, TRIPLE-S, GENERAL ACCIDENT, Association of General Agents of Miscellaneous Insurances ("Association"), Professional Insurance Agents of**

32

Puerto Rico and the Caribbean, Inc. (Professional"), **Saldaña &
Associates, Inc.,** ("Saldaña"), **Antilles Insurance Company**
("Antilles"), **Toledo, Del Valle & Company,** and **First Insurance
Group, Inc. ("First").**

9.4 Early meetings between Insurance Commissioner **Garcia**
and the TC began at least in early October 1996, and extended to
November 1997. Among topics of discussion, were the
"coordination" of *Law 253* insurance and traditional insurance
coverage.

9.5 On March 17, 1997, in furtherance of the Scheme to
Defraud, Insurance Commissioner **Garcia**, on behalf of the OIC,
met with the members of the TC -- including, **PRAICO, GENERAL
ACCIDENT, TRIPLE-S** and **GENERAL ACCIDENT** -- and representatives
of insurance companies **AIG** (now known as **CHARTIS), INTEGRAND,
NATIONAL, First American Company** and **Royal Insurance Company of
Puerto Rico;** and, acting in concert, jointly, aiding and
abetting and conspiring with each other, they all agreed that
all motor vehicle owners would pay the premium for compulsory
liability insurance coverage during the year 1997, at the time
each acquired or renewed the vehicle's license -- even those who
had traditional insurance policies and should have been exempted
from paying duplicative premiums for insurance coverage in the
year 1997. Yet *Law 253* provided that it would be in effect and

implemented in the year 1998. These were overt acts committed as part of the conspiracy to violate *RICO.*

9.6  In furtherance of the Scheme to Defraud, a subsequent TC and OIC meeting was held on March 21, 1997, wherein the following were present: Insurance Commissioner **Garcia**; **Eunice Betancourt** from **PRAICO**; **Edwin Diaz** from **Association**; **Carlos Figueroa** from **Professional**; **Carmen Figueroa** from **TRIPLE-S**; **Rafael Laffitte** from **Saldaña**; **Ramon Antonio Perez** from **First**; **Noemi Ramirez** from **Antilles**; and, **Cristina Moran**, as Advisor. **Ortiz,** Executive President of **JUA**, appeared as a guest. **Arleen Medina** from **COOPERATIVA** was excused from the meeting.

9.7  During the TC March 21 meeting, it was agreed that the Model Mandatory Coverage Application and Policy, which had been previously prepared by the TC, would be a guide for the structuring of the application and policy that the **JUA** and the traditional insurers, individually, could use in the issuance of the compulsory insurance policy. It was further agreed that the TC would draft a letter for the traditional insurance carriers, notifying them that payment for the portion of the premium corresponding to compulsory liability insurance could not be differed and had to be paid at the moment of renewal or issuance of the license; and, that the TC would draft a cover letter to all the traditional insurance carriers, informing them about the implementation of the compulsory liability insurance system,

34

accompanied by the Model Mandatory Coverage Application and Policy. These were overt acts committed as part of the conspiracy to violate *RICO.*

9.8 On April 7, 1997, the TC held another meeting, wherein the following were present: Insurance Commissioner **Garcia**; **Eunice Betancourt** from **PRAICO**; **Edwin Diaz** from **Association**; **Carlos Figueroa** from **Professional**; **Carmen Figueroa** from **TRIPLE-S**; **Rafael Laffitte** from **Saldaña**; **Arleen Medina** from **COOPERATIVA**; **Noemi Ramirez** from **Antilles**; and, **Cristina Moran**, as Advisor. **Ortiz,** Executive President of **JUA,** appeared as a guest.

9.9 The main topic of discussion in the April 7 meeting, was the procedure that should be followed to coordinate the payment of the compulsory liability insurance coverage and the payment of the traditional insurance policy, in light of the requirements and limitations expressed by Treasury and the DTPW. To that end, among several alternatives, the members of the TC selected and suggested to Insurance Commissioner **Garcia** the following procedure in order to avoid duplicative payments of premiums for compulsory insurance coverage:

> Everyone pays his/her insurer the premium of the traditional liability insurance or the premium of the compulsory liability insurance, depending on the type of insurance each individual selects, and receives a certificate of insurance as evidence of payment. The insured shall present the certificate, at payment centers, for the renewal of the license sticker and will not have to pay any money. The procedure shall be similar

35

to the presentation of the certificate of inspection of
the vehicle.

TC's Act No. 42 of April 7, 1997.

9.10 The **JUA's Ortiz** voted against the procedure approved
by the TC in Act No. 42.

9.11 On or about April 9 or 10, 1997, in furtherance of the
Scheme to Defraud, the Board of Directors of the **JUA** (comprised
of **Terrassa** of **PRAICO**, **Miranda-Casañas** of **UNIVERSAL**, **Quiñones** of
**COOPERATIVA**, **Hanftwurzel** of **GENERAL ACCIDENT**, **Rodriguez-Forteza**
and **Rodriguez**) held an emergency meeting. Insurance Commissioner
**Garcia** and **Ortiz**, Executive President of **JUA**, participated in
this meeting.

9.12 During this early April, 1997 meeting, **PRAICO**,
**UNIVERSAL, COOPERATIVA, GENERAL ACCIDENT, JUA** and the OIC,
acting in concert, jointly, aiding and abetting and conspiring
with each other, rejected the procedure approved by the TC in
Act No. 42 to channel the payments of the premiums of the
compulsory and traditional insurance policies through the
respective particular insurer of each motor vehicle owner. These
were overt acts committed as part of the conspiracy to violate
*RICO.*

9.13 On April 16, 1997, in furtherance of the Scheme to
Defraud, **Garcia**, through the OIC, acting in concert, jointly,
aiding and abetting and conspiring with **PRAICO, UNIVERSAL,**

36

**COOPERATIVA**, **GENERAL ACCIDENT** and **JUA**, officially adopted the **JUA's** Board of Director's rejection of the procedure approved by the TC in Act No. 42. This was an overt act committed as part of the conspiracy to violate *RICO.*

9.14 In December 1997, the Legislature of the Commonwealth of Puerto Rico approved a bill granting a 100% tax exemption for the profits obtained by the **JUA** from the sale of compulsory liability insurance policies and the dividends declared by it to the member insurance companies.

9.15 Coincidentally, in December of 1997, in furtherance of the Scheme to Defraud, the Board of Directors of the **JUA** (comprised of **Terrassa** of **PRAICO**, **Miranda-Casañas** of **UNIVERSAL**, **Quiñones** of **COOPERATIVA**, **Hanftwurzel** of **GENERAL ACCIDENT**, **Rodriguez-Forteza** and **Rodriguez**) held a meeting, with the participation of Insurance Commissioner **Garcia** and **Ortiz**, Executive President of the **JUA.**

9.16 During this December 1997 meeting, **PRAICO, UNIVERSAL, COOPERATIVA, GENERAL ACCIDENT,** the **JUA** and the OIC, acting in concert, jointly, aiding and abetting and conspiring with each other, agreed that the **JUA** would be the only insurer that would provide and issue compulsory liability insurance coverage to motor vehicle owners in Puerto Rico. These were overt acts committed as part of the conspiracy to violate *RICO.*

37

9.17 Shortly thereafter, in December 1997, in furtherance
of the Scheme to Defraud, during a meeting with the TC and
members of the **JUA**, Insurance Commissioner **Garcia**, announced
that the **JUA** would be the only insurer that would provide *Law
253* insurance coverage in Puerto Rico and that all payments of
premiums would be channeled through the DTPW. This was an overt
act committed as part of the conspiracy to violate *RICO.*

9.18 In or about December 1997, in furtherance of the
Scheme to Defraud, Insurance Commissioner **Garcia**, through the
OIC, acting in concert, jointly, aiding and abetting and
conspiring with **PRAICO, UNIVERSAL, COOPERATIVA, GENERAL ACCIDENT**
and the **JUA**, promulgated *Regulation LXX.* This regulation
established that every motor vehicle owner shall pay the premium
corresponding to the compulsory liability insurance to the
Secretary of the Treasury at the time of the issuance or renewal
of the license or registration; and, thereafter, the Secretary
of the Treasury will transfer the funds of the premiums paid to
the **JUA** for its eventual distribution among itself and the
traditional insurers. *Rule LXX, Art. 9(a).* Every motor vehicle
for which the premium has been paid is considered to be insured
by the **JUA** (unless its owner has purchased a traditional
insurance policy). *Id., Art. 12(a).* Further, the regulation sets
forth the Puerto Rico Mandatory Liability Insurance Uniform
Policy, defining the terms of the compulsory liability

38

insurance, as the sole written contract between the insured and the **JUA**. *Id.*, *Art. 22.* The promulgation of *Regulation LXX* was an overt act committed as part of the conspiracy to violate *RICO.*

9.19 The effect of the foregoing was to change the nature of the **JUA** from a residual to a primary insurer, able to insure the motor vehicles directly, even if the traditional insurers have not rejected the same; to allow the **JUA** to effectuate insurance coverage directly, without the use of any agent or broker, eliminating the latter from the compulsory liability insurance scheme; and, to establish one uniform compulsory liability insurance policy applicable to all, deliberately obviating the issuance of individual policies to the insured.

9.20 Prior to January 1998, before *Law 253* came into effect, the OIC issued notices advising that all motor vehicle owners would make the payments for compulsory liability coverage to the Department of the Treasury, as billed in the motor vehicle license or registration.

9.21 Even before the implementation of *Law 253* -- which mandated the use of insurance brokers to lower the cost of insurance on the consumer, maximize coverage and foster competition; and, which required the issuance of individual policies -- the Defendants, by agreeing that the **JUA** would be the only insurer providing compulsory liability insurance coverage, through one uniform written policy, which all motor

39

vehicle owners had to purchase at the time of the renewal or issuance of the registrations or licenses, conjured up their Scheme to Defraud. The utilization of insurance brokers and the issuance of paper policies were obviated from the compulsory liability insurance system. However, as shown below, all motor vehicle owners would be forced to pay the **JUA** brokerage fees and policy costs as part of the premium without the participation of any broker or the issuance of any paper policy in the process, in violation of the Puerto Rico Insurance Code. The motor vehicle owners were to pay such fees immediately and in full to the Secretary of the Treasury in order to be authorized to drive their vehicles through the Puerto Rico thoroughfares.

9.22 The Defendants, the **JUA, PRAICO** (now known as **MAPFRE—PRAICO**), **UNIVERSAL, COOPERATIVA, GENERAL ACCIDENT, TRIPLE-S, INTEGRAND, NATIONAL** and **AIG** (now known as **CHARTIS),** jointly with the Insurance Commissioner **Garcia** and the other forenamed individuals and entities, conjured and designed these artifices to defraud and obtain money, which formed part of the Scheme to Defraud, with scienter and deliberate intent to fraudulently induce and force the Plaintiffs and Class Members purchasing the compulsory insurance policy to pay brokerage fees and policy costs -- disguised as legitimate charges in the license or registration printed and mailed to them by the DTPW -- for services that the Defendants had no intention of providing or

40

making available to them, as part of the annual premium rate, to the Department of the Treasury, which would then transfer by wire such funds to the **JUA**. Once in the **JUA's** coffers, the members of the ENTERPRISE misappropriated the monies so paid by the Plaintiffs and Class Members for brokerage services that were never rendered and paper policies that were never issued.

9.23 Billing the Plaintiffs and Class members by means of license and registrations issued by the DTPW and compelling them to pay the mandatory insurance premium to the Department of the Treasury had the effect of legitimizing the Scheme to Defraud by creating the appearance that it had been approved, sanctioned, and condoned by two State government agencies as lawful.

9.24 On August 3, 1999, in furtherance of the Scheme to Defraud, **Ortiz** of **JUA** wrote and mailed a letter to Insurance Commissioner **Garcia** notifying the OIC that the Board of Directors (comprised of **Terrassa** of **PRAICO, Miranda-Casañas** of **UNIVERSAL, Quiñones** of **COOPERATIVA, Gonya** of **NATIONWIDE, Ortiz** of **JUA, Rodriguez-Forteza** and **Rodriguez**) had recently approved the distribution of gains or profits from the sale of compulsory insurance policies; and, requesting the OIC to furnish to the **JUA** the distribution of the premium dollar and the proportional participation of each of its members for the year 1998. As **Ortiz** very well knew, the profits obtained from the sale of policies included proceeds from charges for brokerage services not

41

performed and for policy costs not incurred. This mailing was delivered in violation of the Mail Fraud Statute, *18 U.S.C. § 1341.* Further, this was an overt act committed as part of the conspiracy to violate *RICO.*

9.25 On August 18, 1999, in furtherance of the Scheme to Defraud, **Garcia** wrote and mailed to **Ortiz** a letter approving the distribution of profits among the members of the **JUA** for the year 1998, because the same conformed to the distribution of the premium dollar underlying the premium charged for the compulsory insurance. This mailing was delivered in violation of the Mail Fraud Statute, *18 U.S.C. § 1341.* Further, this was an overt act committed as part of the conspiracy to violate *RICO.*

9.26 At all times material herein -- as stated in the August 18, 1999 letter, from **Garcia** to **Ortiz** -- the distribution of the premium dollar underlying the premium annually charged for the compulsory insurance, as sanctioned by the OIC has been the following one:

| **Concept** | **Percent** |
|---|---|
| Acquisition Cost | 8% |
| Taxes, Licenses and Charges | 1% |
| Administrative cost | 7% |
| Gain | 5% |
| **Subtotal** | 21% |
| Losses & Adjustment for Losses | 79% |
| **TOTAL:** | 100% |

42

9.27 According to the distribution of the premium dollar established by the OIC, 8% is destined to cover the "acquisition cost" consisting in the commission to be paid to the insurance broker and other expenses inherent to the performance of the broker's duties, as specifically acknowledged by the Insurance Commissioner **Garcia**, on August 25, 2000, in Ruling No. CA-8-1578-2000.

9.28 The **JUA's** annual statements for the period covering from 1998 through to 2010, disclosed that it only paid commissions amounting to $8,756.00 to agents as brokerage fees in the year 2000, stopping thereafter to make any additional payment by such concept, despite the mandates of the Commonwealth's Insurance Code that brokers had to be used for the sale of the insurance policies.

9.29 According to the distribution of the premium dollar established by the OIC, 7% is earmarked to cover the "administrative cost" for the issuance of a paper copy of the insurance policy -- as mandated by *26 P.R. Laws Ann § 8054(c)* in conjunction with *Chapter 11 of Title 26 of Puerto Rico Laws Annotated* -- and related expenses*. However, the estimated *real cost* incurred by the **JUA** was a 3%, since it did not issue any policy nor mailed any to the insured, as it is the custom with other insurances. By consequence, there is a 4% of administrative cost of the premium dollar that was not spent.

43

During such 12-year period, the traditional insurer Defendants did not have any administrative cost, or if they had, it was very small.

9.30 According to the distribution of the prime dollar established by the OIC, 5% was supposed to constitute the gain or profit to the insurer for the sale of the compulsory liability insurance policy.

9.31 It follows from the forgoing that from 1998 to 2010, a 12% of the premium dollar destined for acquisition costs and administrative costs was not incurred by Defendants. Although the **JUA** received completely the $99 and $148 annual premiums and distributed substantial profits from those proceeds to the Defendant members of the ENTERPRISE, the funds of expenses not incurred were not reimbursed. This conduct constitutes a violation to *Article 27.160 of the Insurance Code*.

9.32 Moreover, the profit or gain derived by the Defendant members of the ENTERPRISE from the sale of compulsory liability insurance policies in reality amounted to 17% of the prime dollar, instead of the 5% allowed by the OIC.

9.33 Table I below details the collected premiums, plus the acquisition costs not incurred that were collected by the Defendants and not reimbursed to the Representative Plaintiffs and Class Members in violation to *Article 27.160 of the Insurance Code*.

44

**TABLE I**

| Year | Premiums Collected | Percentage Acquisition Costs | Acquisition Costs | Cumulative Acquisition Costs Not Incurred | Percentage Interest | Interest | Acquisition Costs Plus Interests |
|------|--------------------|------------------------------|-------------------|-------------------------------------------|---------------------|----------|----------------------------------|
| 1998 | $219,486,751 | 8.00% | $17,558,940 | $17,558,940 | 6.00% | $1,053,536 | $18,612,476 |
| 1999 | $154,260,785 | 8.00% | $12,340,863 | $29,899,803 | 6.00% | $1,793,988 | $14,134,851 |
| 2000 | $150,211,815 | 8.00% | $12,016,945 | $41,916,748 | 6.00% | $2,515,005 | $14,531,950 |
| 2001 | $165,764,800 | 8.00% | $13,261,184 | $55,177,932 | 6.00% | $3,310,676 | $16,571,860 |
| 2002 | $178,840,198 | 8.00% | $14,307,216 | $69,485,148 | 6.00% | $4,169,109 | $18,476,325 |
| 2003 | $175,829,609 | 8.00% | $14,066,369 | $83,551,517 | 6.00% | $5,013,091 | $19,079,460 |
| 2004 | $186,627,928 | 8.00% | $14,930,234 | $98,481,751 | 6.00% | $5,908,905 | $20,839,139 |
| 2005 | $188,909,000 | 8.00% | $15,112,720 | $113,594,471 | 6.00% | $6,815,668 | $21,928,388 |
| 2006 | $198,456,178 | 8.00% | $15,876,494 | $129,470,965 | 6.00% | $7,768,258 | $23,644,752 |
| 2007 | $186,807,772 | 8.00% | $14,944,622 | $144,415,587 | 6.00% | $8,664,935 | $23,609,557 |
| 2008 | $202,428,047 | 8.00% | $16,194,244 | $160,609,831 | 6.00% | $9,636,590 | $25,830,834 |
| 2009 | $203,642,295 | 8.00% | $16,291,384 | $176,901,214 | 6.00% | $10,614,073 | $26,905,456 |
| 2010 | $192,218,965 | 8.00% | $15,377,517 | $192,278,731 | 6.00% | $11,536,724 | $26,914,241 |

**TOTALS: $2,403,484,143**                                    **$192,278,731**               **$78,800,558**   **$271,079,290**

9.34 As shown in Table I above, and Table II below, the premiums collected in the 1998–2010 period amount to **$2,403,484,143.00.** The 8% in the column under the heading "percentage acquisition costs" in Table I represents the percentage of the premium dollar charged for the insurance broker's commission. The cumulative acquisition costs collected from the insured motor vehicle owners, which in reality were not incurred by the Defendants, add up to **$192,278,731.00.** These monies were never reimbursed. The monies collected under the guise of "acquisition costs" plus the accrued interests totalize **$271,079,290.00.**

9.35 Table II below details the collected premiums, plus the part of the administrative costs not incurred that were collected by the Defendants and not reimbursed to the

45

Representative Plaintiffs and Class Members in violation to Commonwealth Law.

## TABLE II

| Year | Premiums Collected | Percentage Administrative Costs | Administrative Costs | Cumulative Administrative Costs Not Incurred | Percentage Interest | Interest | Administrative Costs Plus Interests |
|------|-------------------|---------------------------------|----------------------|----------------------------------------------|---------------------|----------|-------------------------------------|
| 1998 | $219,486,751 | 4.00% | $8,779,470 | $8,779,470 | 6.00% | $526,768 | $9,306,238 |
| 1999 | $154,260,785 | 4.00% | $6,170,431 | $14,949,901 | 6.00% | $896,994 | $7,067,425 |
| 2000 | $150,211,815 | 4.00% | $6,008,473 | $20,958,374 | 6.00% | $1,257,502 | $7,265,975 |
| 2001 | $165,764,800 | 4.00% | $6,630,592 | $27,588,966 | 6.00% | $1,655,338 | $8,285,930 |
| 2002 | $178,840,198 | 4.00% | $7,153,608 | $34,742,574 | 6.00% | $2,084,554 | $9,238,162 |
| 2003 | $175,829,609 | 4.00% | $7,033,184 | $41,775,758 | 6.00% | $2,506,545 | $9,539,730 |
| 2004 | $186,627,928 | 4.00% | $7,465,117 | $49,240,875 | 6.00% | $2,954,453 | $10,419,570 |
| 2005 | $188,909,000 | 4.00% | $7,556,360 | $56,797,235 | 6.00% | $3,407,834 | $10,964,194 |
| 2006 | $198,456,178 | 4.00% | $7,938,247 | $64,735,483 | 6.00% | $3,884,129 | $11,822,376 |
| 2007 | $186,807,772 | 4.00% | $7,472,311 | $72,207,793 | 6.00% | $4,332,468 | $11,804,778 |
| 2008 | $202,428,047 | 4.00% | $8,097,122 | $80,304,915 | 6.00% | $4,818,295 | $12,915,417 |
| 2009 | $203,642,295 | 4.00% | $8,145,692 | $88,450,607 | 6.00% | $5,307,036 | $13,452,728 |
| 2010 | $192,218,965 | 4.00% | $7,688,759 | $96,139,366 | 6.00% | $5,768,362 | $13,457,121 |

**TOTALS: $2,403,484,143**                                        **$96,139,366**                          **$39,400,279**   **$135,539,645**

9.36 The 4% in the column under the heading "percentage administrative costs" that appears in Table II represents the percentage of the premium dollar the Defendants charged by concept of issuing and sending the paper uniform policies to the insured motor vehicle owners. The cumulative administrative costs collected from the insured motor vehicle owners amounts to **$96,139,366.00.** In reality, the Defendants did not incur in these costs, since the compulsory insurance policies were never issued. The cost for this item was never reimbursed either. The monies collected under the guise of administrative costs plus accrued interests totalize **$135,539,645.00.**

46

9.37 The grand total of costs collected and not reimbursed is **$288,418,097.00.** Accrued interests amount to **$118,200,837.00.** The sum of these amounts yields **$406,618,935.00.** Therefore, the injuries suffered by the Representative Plaintiffs and Class Members during the twelve-year period in question as result of the collection of monies in excess and in violation to Commonwealth law totalize **$406,618,935.00.**

9.38 *Article 27.160 of the Insurance Code* prohibits the collection as premium of any amount that is not "actually expended or in due course to be expended." *26 P.R. Laws Ann. § 2716(2)-(3).* It also mandates the return of the premium or charge for insurance of any sum in excess of the amount really spent. *Id.* The Defendants failed to comply with the express mandate of the law, and in the process they profited with **$406,618,935.00,** which they had to return to the Plaintiffs and the Class Members by express disposition of *Article 27.160.* Nevertheless, the Defendants have made no effort to reduce the compulsory liability premium, enriching themselves in millions of dollars at the expense of the Puerto Rican motor vehicle owners.

9.39 Originally conceived as a residual insurer, the **JUA** was expected to sustain economic losses, which were supposed to be spread among all the traditional insurers that comprise it. The reality has been just the opposite. Since the inception of

the compulsory insurance system, the **JUA** has gained extraordinary profits from the compulsory liability insurance scheme, held valuable investments and distributed substantial amounts in dividends to the traditional insurer Defendants.

9.40 According to the DTPW records, presently 2.4 million motor vehicles exist in Puerto Rico, of which only sixteen percent (16%) have traditional insurance. Between the years 1998 and 2010, the income in annual premiums for the **JUA** and the traditional insurer Defendants, as shown above in Tables I and II, exceeded 2.4 billion dollars ($2,400,000,000.00). Of that amount, the Defendants misappropriated more than 288 million dollars in acquisition costs and administrative costs collected, but not really incurred.

9.41 From 1998 to 2010, as shown in Table III below, the **JUA** reported in its financial statements net income derived from underwriting compulsory insurance policies and investments in the total amount of **$452,635,690.00,** and declared therein the distribution of **$102,737,554.00** in dividends among the Defendant members of the ENTERPRISE: **CAICO, CHARTIS** (formerly known as **AIG**), **COOPERATIVA, INTEGRAND, MAPFRE—PRAICO** (formerly known as **PRAICO**), **NATIONAL, OPTIMA, REAL LEGACY, TRIPLE-S, UNIVERSAL, ROYAL & SUN, PREFERRED RISK, ALLSTATE, GENERAL ACCIDENT** and **NATIONWIDE.**

48

### Table III

| Year | Gross Income | | Net Income | Dividends |
|------|------|------|------|------|
| 1998 | $31,084,738 | *Tax Exempt* | $31,084,738 | $0 |
| 1999 | $31,699,793 | *Tax Exempt* | $31,699,793 | $6,866,837 |
| 2000 | $28,393,696 | *Tax Exempt* | $28,393,696 | $7,597,475 |
| 2001 | $28,418,116 | *Tax Exempt* | $28,418,116 | $7,666,401 |
| 2002 | $11,785,549 | | $8,460,758 | $7,885,243 |
| 2003 | $21,446,479 | | $15,641,566 | $7,898,813 |
| 2004 | $13,096,583 | | $11,166,583 | $8,717,221 |
| 2005 | $8,575,687 | | $8,404,910 | $9,063,916 |
| 2006 | $26,342,497 | | $16,970,636 | $7,593,556 |
| 2007 | $49,804,446 | | $33,681,536 | $9,728,886 |
| 2008 | $75,345,496 | | $47,497,598 | $9,457,678 |
| 2009 | $79,073,396 | | $54,697,238 | $10,079,413 |
| 2010 | $47,569,214 | | $33,655,914 | $10,182,115 |
| **TOTAL** | **$452,635,690** | | **$349,773,082** | **$102,737,554** |

9.42 In furtherance of the Scheme to Defraud, the Defendants **JUA, CAICO, CHARTIS** (formerly known as **AIG**), **COOPERATIVA, INTEGRAND, MAPFRE—PRAICO** (formerly known as **PRAICO**), **NATIONAL, OPTIMA, REAL LEGACY, TRIPLE-S, UNIVERSAL, ROYAL & SUN, PREFERRED RISK, ALLSTATE, GENERAL ACCIDENT** and **NATIONWIDE**, acting in concert, jointly, aiding and abetting and conspiring with each other, knowingly and deliberately, failed, and still continue to fail, to comply with their statutory duty to return the monies collected for costs that were not incurred; and, instead, have unlawfully kept and distribute among themselves millions of dollars that legally correspond to the insured, the reimbursement of which is the object of this legal action.

49

## X. THE PREDICATE ACTS

10.1 In furtherance of the Scheme to Defraud, the Defendants and the other members of the ENTERPRISE, knowingly, intentionally and unlawfully, aided and abetted, conspired and agreed, with each other, to attempt to commit, and each of them, in fact, did commit, as principals, the predicate acts of racketeering detailed hereunder, in violation of *18 U.S.C. § 2.*

10.2 In addition, in furtherance of the Scheme to Defraud, each of the Defendants, all of them members of the ENTERPRISE, conspired, confederated and agreed, with each other, to attempt to commit, and did commit, the predicate acts of racketeering detailed hereunder, and, in doing so, violated the *RICO* prohibitions, as defined in *18 U.S.C. § 1962.*

10.3 Whenever it is alleged in the complaint that any Defendant did any act or thing, it is meant that it, its Directors, Officers, agents, employees, or the Directors, Officers, agents or employees of its subsidiaries or affiliates, performed or participated in such act or thing, and in each instance that such act or thing was authorized or ratified by, and done on behalf of, that Defendant.

10.4 In furtherance of the Scheme to Defraud, as explained hereunder, the predicate racketeering acts consisted of millions of violations of the Mail Fraud Statute, *18 U.S.C. § 1341* and the Wire Fraud Statute, *18 U.S.C. § 1343.*

50

10.5 In furtherance of the Scheme to Defraud, the Defendants and the other members of the ENTERPRISE, also knowingly, intentionally and unlawfully, aided and abetted and conspired in the commission of millions of violations of Puerto Rico statutes, including, among others, the following provisions of the Insurance Code: *26 P.R. Laws Ann. § 329(a)* (conducting insurance transactions through unlicensed individuals); *26 P.R. Laws Ann § 1114* (requiring the issuance of paper insurance policies); and, *26 P.R. Laws Ann. § 2716(2)-(3)* (illegal dealing in premiums).

10.6 These violations were committed by the Defendants and the other members of the ENTERPRISE, through, or by means of, interrelated fraudulent artifices, all which formed part of the same common plan or Scheme to Defraud.

## XI. THE PATTERN OF RACKETEERING ACTIVITY

11.1 In the Scheme to Defraud, the millions of predicate racketeering acts detailed herein below form a pattern, as defined by *18 U.S.C. 1961(5),* inasmuch as they have been committed by the Defendants and the other members of the ENTERPRISE, through continuous, uninterrupted, criminal activity, which began on or around, 1998, which has continued up to the present year, 2011, and which has a high risk of continuing into the future.

51

11.2 In addition, within the Scheme to Defraud, as it is shown herein below, the predicate acts are related given that they have the following commonalties:

a) the same purpose or goal: to illegally collect charges from motor vehicle owners for costs not incurred as part of the insurance premiums, namely brokerage and administrative costs not incurred, and to keep the monies so obtained for the economic benefit of the Defendants, as members of the ENTERPRISE, when the Insurance Code prohibits such practice;

b) the same results: to deprive said motor vehicle owners of their monies and the acquisition of such assets;

c) the same participants: the Defendants and the defined ENTERPRISE;

d) the same victims: the Plaintiffs and the Class Members; and,

e) the same methods of commission: the Scheme to Defraud and the common predicate acts in furtherance thereof through the use of the mails.

11.3 These predicate racketeering acts are otherwise interrelated by the foregoing distinguishing characteristics; and, are not isolated events, since they were carried out for the same purposes in a continuous manner throughout a substantial period of time.

11.4 In the Scheme to Defraud, the continuity and relatedness of these racketeering activities constitute a pattern of racketeering activities within the meaning of *18 U.S.C. § 1961(5)*.

52

## XII. CLASS ALLEGATIONS

12.1 Plaintiffs bring this action on their own behalf and, pursuant to *Rule 23(a), 23(b)(1)(A) & (B), 23 (b)(2)* and/or *(b)(3)* as a class action on behalf of the Class Groups defined in Section III(A), *supra*. This Class seeks certification of claims for declaratory and injunctive relief, and for damages pursuant to *18 U.S.C. § 1962(a)(b)(c) & (d).*

12.2 Each named Plaintiff possesses the same interests and has suffered the same economic injury shared by all the Members of the Class that he represents, which claims for damages and equitable relief arise from the same operative facts and legal theories detailed herein below.

## A. RULE 23(a) NUMEROSITY

12.3 The Plaintiffs Classes are reasonably estimated to consist of the owners of over 2,400,000 motor vehicles registered in the DTPW as duly authorized to travel through Puerto Rico thoroughfares, all with compulsory liability insurance, such as the Plaintiff Representatives.

12.4 The exact total number of Class Members can be reasonably ascertained from the records in the possession or under the control of the Defendants and the DTPW.

12.5 The Members of the Group Classes are certainly so numerous that joinder of all members is impracticable.

53

12.6 On the other hand, the identity and addresses of the Members of the Classes are reasonably ascertainable and can be readily identified from the business records maintained by the Defendants and the DTPW.

12.7 Moreover, individual lawsuits by Class Members are not practical due to the economic cost of the litigation, *vis a vis*, the monetary value of most individual claims which otherwise might well never be vindicated.

12.8 Finally, the reliefs sought by the Representative Plaintiffs and to which Class Members are entitled are uniform within the two separate Classes.

## B. RULE 23(a) COMMONALITY OF FACTS AND LAW

12.9 The factual and legal issues raised in this complaint are common to all Plaintiff Representatives and Class Members, inasmuch as they arise from the same common nucleus of operative facts, the Scheme to Defraud and the different artifices carried out by the Defendants and the members of the ENTERPRISE to achieve the objectives of such scheme (to acquire and maintain control over the ENTERPRISE, to capitalize the ENTERPRISE through fraudulent artifices, and to fraudulently deprive the Class Members of their monies for the Defendants' and the ENTERPRISE'S economic benefit).

12.10 The Plaintiffs and Class Members have been all injured in their property as a direct result of the Defendants'

54

and the ENTERPRISE'S Scheme to Defraud and the artifices used by them to carry it out. They have all been object of the collection of a premium in excess of the monetary amount really spent or in the process of being spent by Defendants for the compulsory liability insurance without having received the refund or return required by law. The Scheme to Defraud and artifices carried out by the Defendants arise from a single course of conduct that is identical for each Plaintiff and the two Classes that they represent. The illegal retention of these monies has resulted in exorbitant gains for the Defendants.

12.11 The adjudication of the issue whether the Defendants and the other members of the ENTERPRISE acted throughout the alleged patterns of racketeering activity involves issues of fact and law that are common to all Plaintiffs and Class Members.

## C. RULE 23(a) TYPICALITY

12.12 The named Plaintiff Representatives and the Class Members, each and all, have tangible and legitimate actionable claims and interests at stake in this action.

12.13 The claims of the named Plaintiff Class Representatives are typical of the claims of the absent Class Members, all of whom have a common origin and share a common basis of fact and law.

55

12.14 The claims of the named Plaintiff Class Representatives and Class Members arise from the same Scheme to Defraud and the artifices carried out by Defendants and the members of the ENTERPRISE to achieve its goal. That is, the claims of the named Plaintiff Class Representatives and Class Members arise from the same patterns of racketeering activity and are based upon the same legal theories which are alleged to be in violations of the RICO Act. Thus, the individual characteristics of the named Plaintiffs are typical of the ones of the Class Members that they represent.

12.15 Defendants have acted in the same way toward Plaintiffs and the members of the Classes they represent. As a result thereof, each named Plaintiff has been personally injured by the illegal conduct of Defendants in a way typical to the injury caused to the members of the Classes they represent.

12.16 The claims of the named Plaintiffs will necessarily require proof of the same material and substantive facts, rely upon the same remedial theories, and seek the same relief than the claims that can be made by the Class Members they represent.

12.17 The claims and remedial theories pursued by the named class representatives are sufficiently aligned with the interests of absent Class members to ensure that the claims of the Class will be prosecuted with diligence and care by Plaintiffs as representatives of the Class.

**D. RULE 23(a) ADEQUACY OF REPRESENTATION**

12.18 The claims of the named Plaintiffs and the members of the two Classes they are willing and prepared to represent are so interrelated that the interests of the Class Members will be adequately protected in their absence by Plaintiffs, complying with all of the obligations and duties material thereto.

12.19 Plaintiffs have no interests adverse to the interests of the Class Members. The self-interests of the named Class Representatives are equal, and not antagonistic, to those of the absent Class Members. The proposed representatives will, thus, undertake to well and truly protect the interests of the absent Class Members.

12.20 The named plaintiffs have engaged the services of the undersigned counsels. Said counsels are experienced in complex litigation, will adequately prosecute this action, and will assert, protect and otherwise well represent the named Class Representatives and absent Class Members.

**E. RULE 23(b)(1)(A) & (B)**

12.21 The prosecution of separate actions by individual members of the Class would create a risk of adjudications with respect to individual members of the Class, which would, as a practical matter, be dispositive of the interests of the other similarly situated members of the Class who are not parties to

the action, and/or could substantially impair or impede their ability to protect their interests.

12.22 The prosecution of separate actions by individual members of the Class would also create a risk of inconsistent or varying adjudications with respect to individual Members of the Class, which would establish incompatible standards of conduct for the parties opposing the Class. Such incompatible standards and inconsistent or varying adjudications, on what would necessarily be the same issues of facts, evidence and theories of law, would also create and allow to exist inconsistent and incompatible rights within the Plaintiff Class.

**F. RULE 23(b)(2)**

12.23 Defendants have acted or refused to act on grounds generally applicable to the Class, making final declaratory or injunctive relief appropriate.

**G. RULE 23(b)(3)**

12.24 The questions of law and fact common to members of the Classes predominate over any questions affecting only individual members.

12.25 Under these circumstances, a class action is superior to individual claims and may be the only practical method for the fair and efficient adjudication of the controversies alleged in this complaint, inasmuch as:

58

a. Individual claims by the Class Members are impractical as the costs of litigation may far exceed what any one plaintiff or Class member has at stake.

b. There has been no individual litigation over the federal RICO violations raised herein, and individual Class Members should have no interest in prosecuting and controlling separate federal RICO actions.

c. The litigation of the federal RICO claims herein should be concentrated in this forum, because all the parties are found within, and are under the jurisdiction of this District Court.

d. The proposed Class Action can be readily managed with the assistance of the guidelines contained in the Manual for Complex Litigation adopted by the Federal Judicial Center.

## XIII. LAW VIOLATIONS IN FURTHERANCE OF THE SCHEME TO DEFRAUD

### COUNT I — VIOLATIONS TO SECTION 1962(c) OF RICO

**A. THE ENTERPRISE:**

13.1 The preceding paragraphs are hereby incorporated herein as though fully set forth and are made a part of this paragraph.

13.2 This cause of action arises under *18 U.S.C. § 1962(c)* and is asserted against all the Defendants.

13.3 Each of the Defendants, the **JUA, CAICO, CHARTIS** (formerly known as **AIG**), **COOPERATIVA, INTEGRAND, MAPFRE—PRAICO** (formerly known as **PRAICO**), **NATIONAL, OPTIMA, REAL LEGACY, TRIPLE-S, UNIVERSAL, PREFERRED RISK, ROYAL & SUN, ALLSTATE, GENERAL ACCIDENT** and **NATIONWIDE,** for purposes of this particular cause of action, is or has been a "person" employed by or associated with an enterprise engaged in, or the activities of

59

which affect, foreign or interstate commerce, and as such, has conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity as described herein before.

13.4 For purposes of this particular cause of action under *Section 1962(c),* the ENTERPRISE is the association in fact defined in Section VIII, *supra.*

13.5 Since on or around, 1997, the Defendants and the other members of the ENTERPRISE, knowingly, intentionally and unlawfully, aided and abetted, and conspired with each other, to devise, or intend to devise the Scheme to Defraud, by which they were to illegally obtain, acquire and maintain control of the refundable payments paid by the Representative Plaintiffs and Class Members, to later illegally keep those assets for their own pecuniary benefit and interest.

13.6 In furtherance of their Scheme to Defraud and of their conspiracy, and in order to effects its objectives, the ENTERPRISE, knowingly, intentionally and unlawfully, aided and abetted to commit, attempted to commit, conspired to commit, did commit, and caused to be committed, the below enumerated overt and/or predicate acts of racketeering activity to illegally charge the Representative Plaintiffs and Class Members monies for non-incurred costs as part of the annual insurance premiums

and subsequently retain the refundable payments made in excess by the Representative Plaintiffs and Class Members.

**B. RACKETEERING PREDICATE ACTS:**

13.7 From 1998, to the present, for the purpose of executing the ENTERPRISE's Scheme to Defraud, the Defendants caused the DTPW to place in the post offices or authorized depositories for mail matter envelopes, containing the motor vehicles licenses or registrations which were thereafter delivered, by the United States Postal Service, to all motor vehicles owners in Puerto Rico, in violation of the Mail Fraud Statute, *18 U.S.C. § 1341*. The motor vehicles licenses or registrations contained the billing for the annual premium for the compulsory insurance policy, which fraudulently included an acquisition cost that was never going to be spent, plus an administrative cost that was never going to be incurred by the Defendants. Moreover, the motor vehicle licenses or registrations fraudulently omitted the utterly relevant and essential information that those parts of the dollar-premium collected in excess were refundable.

13.8 Envelopes containing motor vehicles licenses or registrations were delivered by the United States Postal Service to:

a. Plaintiff Representative **Noemi Torres Ronda**, in the years 1998 through 2011.

61

b. Plaintiff Representative **Angelo Rivera Lamboy**, in the years 2005 through 2011.

13.9 The specific months and days when the envelopes, addressed to the Plaintiffs and containing licenses or registrations, were caused to be place in the post offices or authorized depositories for mail matter, as well as the specific dates on which similar envelopes were mailed to the Class Members, can be readily ascertained from the records in the possession or under the control of the DTPW.

13.10 Each of these mailings is a predicate act that is indictable as mail fraud and together they constitute a pattern of racketeering activity.

13.11 After receiving each annual license or registration by mail, each Representative Plaintiff, like every other Class Member, paid the premium for the compulsory liability insurance to the Secretary of the Treasury.

13.12 After collecting the annual premiums from the Representative Plaintiffs and Class Members, the Secretary of the Treasury turned over the total proceeds to the **JUA**, including the monies they paid as premiums in excess of the monetary amount really spent or to be spend by the Defendants for compulsory liability insurance coverage; and, thereafter, the **JUA** distributed such proceeds among the traditional insurers and itself.

13.13 The Defendants, knowingly, intentionally and unlawfully, failed to reimburse to the Representative Plaintiffs and Class Members the price they unknowingly paid for non-incurred costs hidden in the annual insurance premium rate. Instead, the Defendants embezzled such funds for their own pecuniary benefit.

13.14 Through the conduct described herein above, in furtherance of the Scheme to Defraud, the members of the ENTERPRISE knowingly, intentionally and unlawfully, aided and abetted and conspired with each other to violate, and did violate *Article 27.160 of the of Puerto Rico Insurance Code*, *26 P.R. Laws Ann. § 2716(2)-(3)* (illegal dealing in premiums).

13.15 Through the conduct described herein above, the Defendants and the other members of the ENTERPRISE, which is engaged in, and which activities affect interstate commerce, knowingly, intentionally and unlawfully, aided and abetted, conspired to, and each of them in fact did, conduct or participate, directly or indirectly, in the conduct of the ENTERPRISE's affairs, through a pattern of Mail Fraud, in violation of *18 U.S.C. § 1962(c)*.

## C. THE INJURY BY REASON OF THE VIOLATION OF SECTION 1962(c)

13.16 As proximate cause of the Defendants' violations to *Section 1962(c)*, the Plaintiffs and Class Members were injured in their property inasmuch as each has been object of fraud in

63

the collection of a premium in excess of the monetary amount really spent or in the process of being spent by the Defendants for the compulsory liability insurance policy, without having received the refund or return required by law.

13.17 The injuries suffered by the Representative Plaintiffs and Class Members since 1998, and up to 2010, is reasonably estimated in the amount of **$406,618,935.00.**

13.18 Pursuant to *18 U.S.C. § 1964(c)*, the Plaintiffs and the Class Member they represent, shall recover threefold the damages they have sustained.

13.19 Pursuant to *18 U.S.C. § 1964(c)*, the Plaintiffs are entitled to reasonable attorneys' fees.

**THEREFORE,** the Plaintiffs demand that Judgment be entered in their favor and the Class Members they represent, and against the Defendants: ordering the Defendants, to reimburse to the Plaintiff Representatives and Class Members threefold the monies they have collected as premiums in excess of the monetary amount really spent by the Defendants for compulsory liability insurance coverage, which up to the year 2010 yield the amount of **ONE BILLION TWO HUNDRED NINETEEN MILLION EIGHT HUNDRED FIFTY TWO THOUSAND EIGHT HUNDRED AND FIVE DOLLARS ($1,219,852,805.00);** granting them pre-judgment and post-judgment interests; awarding them a reasonable amount for attorneys' fees, plus the costs of

-64-

this action; and, granting such other further relief that under
the circumstances may seem appropriate to this Honorable Court.

### COUNT II — VIOLATIONS TO SECTION 1962(a) OF RICO

**A. THE ENTERPRISE:**

13.20  The preceding paragraphs are hereby incorporated
herein as though fully set forth and are made a part of this
paragraph.

13.21 This cause of action arises under *18 U.S.C. § 1962(a)*
and is asserted only against the **JUA.**

13.22 For purposes of this particular cause of action under
*Section 1962(a),* the **JUA** is the ENTERPRISE*.*

13.23 The **JUA** is "an entity capable of holding a legal or
beneficial interest in property", and a "person" within the
meaning of *18 U.S.C. § 1961(3).*

13.24 The **JUA** conducts in Puerto Rico, either directly or
through its business transactions with the traditional insurer
Defendants, the business of selling motor vehicle compulsory
liability insurance policies.

**B. THE RACKETEERING INCOME:**

13.25 Through the conduct described herein before, the **JUA**,
as the ENTERPRISE, which is engaged in, and which activities
affect interstate commerce, knowingly, intentionally and
unlawfully, received income derived, directly or indirectly,

from the pattern of racketeering activity in which the **JUA** participated as a principal within the meaning of *Section 2, Title 18, United States Code (18 U.S.C. § 2)*, committing predicate acts of mail fraud; the **JUA** then used or invested, directly or indirectly, part of such income, or the proceeds of such income, in the operation of itself as an ENTERPRISE, *i.e.,* the sale of motor vehicle compulsory liability insurance policies fraudulently containing hidden charges for non-incurred costs to derive racketeering income, in violation of *18 U.S.C. § 1962(a)*.

13.26 From 1998, to the present, for the purpose of executing the ENTERPRISE's Scheme to Defraud, the **JUA** transmitted or caused to be transmitted, by means of wire, funds, which included racketeering proceeds gained from the Scheme to Defraud, in interstate commerce, to a financial institution in Chicago, Illinois.

13.27 In December 2002, the OIC completed an "Examination Report" of the JUA for the periods comprising from January 1, 1997, through June 30, 2001, wherein it was found that the **Northern Trust Company**, in Chicago, Illinois, was handling 100% of the **JUA's** investments. The investment transactions between the **JUA** and **Northern Trust Company** were all conducted by means of electronic transfers such as "book entries" effectuated by a

"registrar." The evidence of such transfers was maintained through electronic entries and devoid of physical documentary receipts of the investments. The funds so transferred by interstate wire included monies the Defendants embezzled or misappropriated from the Plaintiffs and Class Members as result of the Scheme to Defraud, in violation of the Wire Fraud Statute, *18 U.S.C. § 1341.*

13.28 Upon information and belief, at least up to 2009, the **Northern Trust Company** continued to handle the **JUA's** investments and the investment transactions continued to be conducted by means of electronic transfers.

13.29 The specific date when each wire transfer of funds was made can be readily ascertained from the records in the possession or under the control of the **JUA** and the **Northern Trust Company.**

13.30 Each of these wire transfers is a predicate act that is indictable as wire fraud and together they also constitute a pattern of racketeering activity.

13.31 From 1998 to 2008, as shown in Table IV below, the **JUA** reported **$322,892,940.00** in net income derived from its investments, as follows:

**TABLE IV**

| Year | Investment Income | Investment Gain | Total income From Investments |
|------|-------------------|-----------------|-------------------------------|
| 1998 | $6,767,898 | $0 | $6,767,898 |
| 1999 | $9,306,809 | −$552,474 | $8,754,335 |
| 2000 | $12,142,524 | $710,511 | $12,853,035 |
| 2001 | $11,769,936 | $4,426,037 | $16,195,973 |
| 2002 | $6,316,884 | $1,769,451 | $8,086,335 |
| 2003 | $7,687,535 | $2,689,996 | $10,377,531 |
| 2004 | $9,349,563 | $1,907,637 | $11,257,200 |
| 2005 | $9,252,932 | | $8,564,727 |
| 2006 | $9,836,631 | $2,352,960 | $9,836,631 |
| 2007 | $11,881,736 | −$20,320 | $11,881,736 |
| 2008 | $12,470,940 | −$6,146,912 | $64,152,640 |
| Totals | $106,783,388 | $7,136,886 | $113,920,274 = $322,892,940 |

13.32 Through the conduct described above, the **JUA**, as the ENTERPRISE, which is engaged in, and which activities affect interstate commerce, knowingly, intentionally and unlawfully, received income from investments, which was derived, directly or indirectly, from the pattern of racketeering activity in which the **JUA** participated as a principal within the meaning of *Section 2, Title 18, United States Code (18 USCS § 2),* committing predicate acts of wire fraud; the **JUA** then used or invested, directly or indirectly, part of such income, or the proceeds of such income, in the operation of itself as an ENTERPRISE, *i.e.,* the sale of motor vehicle compulsory liability insurance policies fraudulently containing hidden charges for non-incurred costs to derive racketeering income, in violation of *18 U.S.C. § 1962(a).*

-68-

**C. THE INJURY BY REASON OF THE VIOLATION OF SECTION 1962(a):**

13.33 As proximate cause of the **JUA's** violations to *Section 1962(a)*, the Plaintiffs and Class Members were injured in their property inasmuch as each has been object of fraud in the collection of a premium in excess of the monetary amount really spent or in the process of being spent by Defendants for the compulsory liability insurance policy, without having received the refund or return required by law.

13.34 The injuries suffered by the Representative Plaintiffs and Class Members since 1998, and up to 2010, is reasonably estimated in the amount of **$406,618,935.00.**

13.35 Pursuant to *18 U.S.C. § 1964(c)*, the Plaintiffs and the Class Member they represent, shall recover threefold the damages they have sustained.

13.36 Pursuant to *18 U.S.C. § 1964(c)*, the Plaintiffs are entitled to reasonable attorneys' fees.

**THEREFORE,** the Plaintiffs demand that Judgment be entered in their favor and the Class Members they represent, and against the Defendants: ordering the Defendants, to reimburse to the Plaintiff Representatives and Class Members threefold the monies they have collected as premiums in excess of the monetary amount really spent by the Defendants for compulsory liability insurance coverage, which up to the year 2010 yield the amount

of **ONE BILLION TWO HUNDRED NINETEEN MILLION EIGHT HUNDRED FIFTY TWO THOUSAND EIGHT HUNDRED AND FIVE DOLLARS ($1,219,852,805.00)**; granting them pre-judgment and post-judgment interests; awarding them a reasonable amount for attorneys' fees, plus the costs of this action; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

**COUNT III — VIOLATIONS TO SECTION 1962(d) OF RICO**

**A. THE ENTERPRISE:**

13.37 The preceding paragraphs are hereby incorporated herein as though fully set forth and are made a part of this paragraph.

13.38 This cause of action arises under *18 U.S.C. § 1962(d)* and is asserted against all the Defendants.

13.39 For purposes of this particular cause of action under *Section 1962(d),* the ENTERPRISE is the association in fact defined in Section VIII, *supra.*

**B. THE CONSPIRACY:**

13.40 All the Defendants and others unknown, aiding and abetting each other, acting in concert and/or combination, did knowingly, intentionally, and unlawfully agree to commit the multiple predicate acts of mail fraud (specifically described herein before) forming the alleged pattern of racketeering activity (also described herein before), as part of their

-70-

unlawful Scheme to Defraud the, and to obtain money from, the Representative Plaintiffs and Class Members who purchased or acquired the motor vehicle compulsory liability insurance policies fraudulently containing the hidden charges for non-incurred costs, and thereby unlawfully defrauded the Representative Plaintiffs and Class Members.

13.41 All the Defendants have violated *Section 1962(d)*, inasmuch as, in furtherance of their Scheme to Defraud and in order to effects its objectives, they knowingly, intentionally, and unlawfully, aiding and abetting each other, conspired to conduct and participate in, and did conduct and participate in, directly or indirectly, the affairs of the ENTERPRISE, through the pattern of racketeering activity described herein before, in violation to *Section 1962(c)*.

**C. THE INJURY BY REASON OF THE VIOLATION OF SECTION 1962(d):**

13.42 As proximate cause of the **JUA's** violations to *Section 1962(d)*, the Plaintiffs and Class Members were injured in their property inasmuch as each has been object of fraud in the collection of a premium in excess of the monetary amount really spent or in the process of being spent by Defendants for the compulsory liability insurance policy, without having received the refund or return required by law.

13.43   The   injuries   suffered   by   the   Representative Plaintiffs   and   Class   Members   since   1998,   and   up   to   2010,   is reasonably estimated in the amount of **$406,618,935.00.**

13.44 Pursuant to *18 U.S.C. § 1964(c)*, the Plaintiffs and the   Class   Member   they   represent,   shall   recover   threefold   the damages they have sustained.

13.45 Pursuant to *18 U.S.C. § 1964(c)*, the Plaintiffs are entitled to reasonable attorneys' fees.

**THEREFORE**, the Plaintiffs demand that Judgment be entered in their favor and the Class Members they represent, and against the Defendants:   ordering   the   Defendants,   to   reimburse   to   the Plaintiff Representatives and Class Members threefold the monies they have collected as premiums in excess of the monetary amount really   spent   by   the   Defendants   for   compulsory   liability insurance coverage, which up to the year 2010 yield the amount of **ONE BILLION TWO HUNDRED NINETEEN MILLION EIGHT HUNDRED FIFTY TWO THOUSAND EIGHT HUNDRED AND FIVE DOLLARS ($1,219,852,805.00);** granting them pre-judgment and post-judgment interests; awarding them a reasonable amount for attorneys' fees, plus the costs of this action; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## COUNT IV — THE INSURANCE CODE VIOLATIONS

13.46 The preceding paragraphs are hereby incorporated herein as though fully set forth and are made a part of this paragraph.

13.47 This cause of action arises under the Puerto Rico Insurance Code and is asserted against all the Defendants.

13.48 *Article 27.160 of the Insurance Code* prohibits the insurers to collect premiums for its policies that include items or charges which are improper, speculative or do not adjust to reality and the insurers are obliged to give back the excess of the amount really spent or on the way to being spent for the corresponding insurance.

13.49 The Defendants conspired to, and did, engage in conduct designed to deceive the Representative Plaintiffs and the Class Members and take their money and property under false pretenses and through improper, inequitable and illegal means.

13.50 Not reimbursing the 8% of acquisition costs and the 4% of administrative costs for the uniform premiums of $99 and $148, which were not incurred, constitutes a flagrant violation to *Article 27.160 of the Insurance Code*, which forbids the illegal dealing in premiums.

13.51 As a result of the mentioned conspiracy and illegal conduct, the Defendants wrongfully obtained money belonging to

the Representative Plaintiffs and the Class Members and were thereby unjustly enriched at the latter's expense.

13.52 The Defendants are jointly and severally responsible and liable for disgorging all money that they wrongfully obtained through their illegal conduct, and for restoring such money to the Representative Plaintiffs and the Class Members, plus pre-judgment and post-judgment interest.

13.53 The Defendants have denied responsibility for the damages claimed herein. Due to said obstinate and temerarious denial, and pursuant to the provisions of *Rule 44 of the Rules of Civil Procedure of the Commonwealth of Puerto Rico*, the Representative Plaintiffs and the Class Members are also entitled to be awarded a reasonable amount for attorneys' fees.

**THEREFORE,** the Plaintiffs demand that Judgment be entered in their favor and the Class Members they represent, and against the Defendants: ordering the Defendants, to reimburse to the Plaintiff Representatives and Class Members the amounts of money they have collected as premiums in excess of the monetary amount really spent by the Defendants for compulsory liability insurance coverage, which up to the year 2010 yield the amount of **FOUR HUNDRED MILLION SIX HUNDRED EIGHTEEN THOUSAND NINE HUNDRED THIRTY FIVE DOLLARS ($406,618,935.00);** granting them pre-judgment and post-judgment interests; awarding them a

reasonable amount for attorneys' fees, plus the costs of this action; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

## COUNT V — DECEIT ("DOLO") IN THE FULFILLMENT OF CONTRACTUAL OBLIGATIONS

13.54 The preceding paragraphs are hereby incorporated herein as though fully set forth and are made a part of this paragraph.

13.55 This cause of action arises under the Puerto Rico Civil Code and is asserted against all the Defendants.

13.56 The Defendants, knowingly and intentionally, through deceitful means, avoided complying with their contractual obligation of reimbursing the costs for the uniform premiums of $99 and $148, which were not incurred, to the Representative Plaintiffs and the Class Members.

13.57 The Defendants are jointly and severally responsible and liable for disgorging all money that they wrongfully obtained through their illegal conduct, and for restoring such money to the Representative Plaintiffs and the Class Members, plus pre-judgment and post-judgment interest.

13.58 The Defendants have denied responsibility for the damages claimed herein. Due to said obstinate and temerarious denial, and pursuant to the provisions of *Rule 44 of the Rules of Civil Procedure of the Commonwealth of Puerto Rico*, the

Representative Plaintiffs and the Class Members are also entitled to be awarded a reasonable amount for attorneys' fees.

**THEREFORE**, the Plaintiffs demand that Judgment be entered in their favor and the Class Members they represent, and against the Defendants: ordering the Defendants, to reimburse to the Plaintiff Representatives and Class Members the amounts of money they have collected as premiums in excess of the monetary amount really spent by the Defendants for compulsory liability insurance coverage, which up to the year 2010 yield the amount of **FOUR HUNDRED MILLION SIX HUNDRED EIGHTEEN THOUSAND NINE HUNDRED THIRTY FIVE DOLLARS ($406,618,935.00)**; granting them pre-judgment and post-judgment interests; awarding them a reasonable amount for attorneys' fees, plus the costs of this action; and, granting such other further relief that under the circumstances may seem appropriate to this Honorable Court.

### XIV. PERMANENT INJUNCTION AND DECLARATORY JUDGMENT

14.1 The preceding paragraphs are hereby incorporated herein as though fully set forth and are made a part of this paragraph.

14.2 A permanent injunction and a declaratory judgment will serve the public interest in putting an end to the Defendants' fraudulent conduct, where they, knowingly, intentionally and willfully, fraudulently collected and continue to collect funds

in their annual insurance premium as the purported acquisition (i.e. brokerage fees) and administrative costs that are not going to be incurred, without thereafter effectuating the corresponding refund or return of such non-incurred costs to the Representative Plaintiffs and the Class Members, in violation to the dispositions of the Puerto Rico Insurance Code.

14.3 The issuance of a permanent injunction and a declaratory judgment will also serve the public interest in putting an end to the illegal retention by Defendants of the portion of premium or charge for compulsory insurance in excess of the amount really spent by the insurer, which resulted and continues to result in a windfall to Defendants of millions of dollars of illegal gains, in violation of *RICO*.

14.4 The Defendants' unlawful conduct, if allowed to prevail, will cause the Representative Plaintiffs and Class Members permanent irreparable injury, as discussed, *ante.*

14.5 The injuries to the Representative Plaintiffs and Class members far outweigh any harm which may be caused to Defendants should the Court grant the injunctive relief.

14.6 A permanent injunction and a declaratory judgment will serve the public interest in that the Representative Plaintiffs and Class Members will not be subjected to the Defendants' unlawful conduct and will not be deprived of their personal

property.

## XV. PRAYER FOR RELIEF

**WHEREFORE,** it is respectfully requested that Judgment be entered by this Honorable Court in favor of the Plaintiffs and jointly and severally against the Defendants:

A. Certifying the Classes defined in this complaint.

B. Granting the Plaintiffs and Class Members all the monetary compensations and equitable relief requested in the complaint.

C. Imposing upon the Defendants the payment of all costs and expenses to be incurred in this lawsuit.

D. Granting the Plaintiffs and Class Members reasonable attorneys' fees.

E. The issuance of a permanent injunction and declaratory judgment barring the Defendants continued conduct and practices.

F. Granting the Plaintiffs any other relief that they may be entitled to as a matter of law.

**RESPECTFULLY SUBMITTED.** In San Juan, Puerto Rico, this 18th day of August, 2011.

**ATTORNEYS FOR PLAINTIFFS:**

S/JOSE F. QUETGLAS JORDAN
USDC-PR NO. 203411
Email: jfquetglas@gmail.com

S/PEDRO R. VAZQUEZ III
USDC-PR NO. 216311
Email: prvazquezhotmail.com

S/ERIC QUETGLAS-JORDAN
USDC-PR No. 202514
Eric@Quetglaslaw.com

QUETGLAS LAW OFFICES
PO Box 16606
San Juan PR, 00908-6606
Tel: (787) 722-0635/722-7745
Fax: (787) 725-3970